## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDEX CORPORATION,<br>942 S. Shady Grove Rd.<br>Memphis, TN 38120<br><br>*Plaintiff*,<br><br>v.<br><br>U.S. DEPARTMENT OF COMMERCE<br>1401 Constitution Ave., NW<br>Washington, DC 20230; and<br><br>WILBUR ROSS,<br>in his official capacity as Secretary of<br>Commerce, as well as his successors and assigns,<br>U.S. Department of Commerce<br>1401 Constitution Ave., NW<br>Washington, DC 20230; and<br><br>BUREAU OF INDUSTRY AND SECURITY<br>U.S. Department of Commerce<br>1401 Constitution Ave., NW<br>Room 2099B<br>Washington, DC 20230; and<br><br>NAZAK NIKAKHTAR,<br>in her official capacity as Assistant Secretary for<br>Industry and Analysis, as well as her successors<br>and assigns,<br>Bureau of Industry and Security<br>U.S. Department of Commerce<br>1401 Constitution Avenue, NW<br>Room 2099B<br>Washington, DC 20230,<br><br>*Defendants*. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

1.      Plaintiff FEDEX CORPORATION ("*FedEx*") brings this Complaint against Defendants the U.S. DEPARTMENT OF COMMERCE (the "*DOC*"); WILBUR ROSS, in his official capacity as Secretary of Commerce ("*Ross*"); the BUREAU OF INDUSTRY AND SECURITY (the "*BIS*"), and NAZAK NIKAKHTAR, in her official capacity as Assistant Secretary for Industry and Analysis, performing the non-exclusive duties of the Under Secretary for Industry and Security ("*Nikakhtar*" and, together with DOC, Ross, and BIS, "*Defendants*").

## NATURE OF THE ACTION

2.      FedEx is a global business that provides its customers with transportation, e-commerce, and business solutions.  Perhaps its best recognized offering is its time-sensitive, air-ground express service that ships packages for customers worldwide.

3.      FedEx receives approximately fifteen million packages for shipment daily.  To support its operations, FedEx has developed a complex logistics system consisting of over 450,000 team members, 2,150 express stations, 13 air express hubs, 679 aircraft, 650 airports, 39 ground hubs, 600 ground facilities and 180,000 motorized vehicles spanning more than 220 countries and territories to ensure packages get from their point of origin to their destination safely and in compliance with applicable laws.

4.      Millions of participants in the global economy rely on FedEx for their transportation and freight needs.  As a common carrier, FedEx is subject to a variety of statutory and regulatory regimes.  In the United States, FedEx is subject to the Export Control Reform Act of 2018, 50 U.S.C. §§ 4801 *et seq.* (the "*ECRA*") and its implementing regulations, the Export Administration Regulations, 15 C.F.R. §§ 730 *et seq.* (the "*EAR*" and together with the ECRA, the "*Export Controls*").

5.      To comply with the Export Controls, FedEx screens the names and addresses of its shippers and the designated recipients prior to delivering any package in order to identify whether the sender and/or recipient are an entity or person on the EAR's "Entity List," *i.e.*, a list of "persons reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States." 15 C.F.R. § 744.16.  Indeed, FedEx has developed a sophisticated proprietary risk-based compliance system to perform such screening and takes seriously its responsibility to comply with the law.

6.      However, the Export Controls—specifically, the EAR—require considerably more screening than possible from common carriers like FedEx.[1]  For example, the EAR require FedEx and similarly situated common carriers to ensure that packages containing "items" (a broad term encompassing commodities, software, and technology) subject to the EAR that are described on the Commerce Control List ("*CCL*"), 15 C.F.R. § 774, are not exported to jurisdictions that require BIS export licenses, unless such licenses are in fact in place.  The determination of whether the tendered package contains an "item subject to the EAR" and whether a license is required are virtually impossible for common carriers to comply with.

7.      Typically, the law offers protection for common carriers, excepting them from liability for the contents of packages and communications they transmit, such as internet service providers and telecommunications companies.  *See, e.g.*, 21 U.S.C. § 822(c) (excepting "common or contract carrier[s]" from the criminal transport provisions of the Controlled Substances Act); 47 U.S.C. § 230(c)(1) (immunizing internet service providers from liability for the content of their users under the Communications Decency Act of 1996).  The EAR, however,

---

[1] The EAR define common carriers such as FedEx as "forwarding agents." 15 C.F.R. § 772.1.

offer no safe harbor provision.  To the contrary, the EAR hold common carriers liable as aiders and abettors of the EAR violations committed by their customers, with steep penalties.

8.      Thus, the EAR essentially deputize FedEx to police the contents of the millions of packages it ships daily even though doing so is a virtually impossible task, logistically, economically, and in many cases, legally.  Indeed, the majority of transactions begin with the customer providing FedEx with a previously sealed package.

9.      Even if it could inspect every shipment, the complexity of the EAR would render such a potentially-privacy-infringing program ineffective.[2]  *See generally United States v. Jacobsen*, 466 U.S. 109, 114 (1984) ("Letters and other sealed packages are in the general class of effects in which the public at large has a legitimate expectation of privacy.").  Common carriers, as transporters for the public, cannot reasonably be expected to police the contents and ultimate destinations of the millions of daily shipments to ensure compliance with the EAR.

10.     Without a safe harbor, the EAR give FedEx two options:  continue to operate under threat of imminent enforcement actions, or cease operations that may conceivably lead to enforcement and face possible legal consequences from customers and foreign governments. The Due Process Clause of the Fifth Amendment to the U.S. Constitution was enacted to prevent such oppression and deprivations of liberty.

11.     Accordingly, FedEx brings this action for declaratory and injunctive relief to secure its constitutional due process and other rights which are imminently threatened by

Defendants' enforcement of provisions of § 736 the EAR.  Further, the regulatory regime imposed by the EAR is such a substantial burden that it deprives FedEx of substantive due process under the Fifth Amendment.  Thus, this Court should review, declare unlawful, and permanently enjoin Defendants' unconstitutional actions.  Further, in implementing this regulatory regime, Defendants have exceeded their statutory grant of authority under the ECRA, and Defendants' actions must be enjoined.

## THE PARTIES

12.     Plaintiff FedEx is a Delaware corporation with its principal place of business at 942 S. Shady Grove Rd., Memphis, Tennessee 38120.  FedEx is a transportation, business services, and logistics company, with global operations.

13.     Defendant DOC is the U.S. agency that implements and enforces the EAR.  The DOC is headquartered at 1401 Constitution Ave., NW, Washington, DC 20230.

14.     Defendant Ross is the current Secretary of Commerce and is named in his official capacity, as well as his successors and assigns.  He is charged with certain functions involved in the implementation of the EAR, and is further authorized to delegate such powers and authority to subordinate employees within the DOC.  The DOC is headquartered at 1401 Constitution Ave., NW, Washington, DC 20230.

---

[2] For instance, "items subject to the EAR" include, *inter alia*, "[a]ll U.S. origin items wherever located" and "[f]oreign-made commodities that incorporate controlled U.S.-origin commodities . . . [i]n quantities exceeding the *de minimis* levels" established under the EAR.  *See* 15 C.F.R. § 734.3(a)(2), (3).  A visual inspection of the contents of a package is unlikely to reveal whether a foreign-made item "incorporates" sufficient controlled U.S. content to make the item subject to the EAR.  Similarly, determining whether an "item subject to the EAR" is described on the CCL generally requires intimate technical knowledge of the item's capabilities and makeup. Consequently, opening packages to ascertain compliance would prove useless and ineffective.

15.     Defendant BIS is a bureau (*i.e.*, an agency) within the DOC.   Among other activities, the BIS administers and enforces the EAR.   The BIS is headquartered at 1401 Constitution Ave., NW, Room 2099B, Washington, DC 20230.

16.     Defendant Nikakhtar is the current Assistant Secretary for Industry and Analysis at the BIS and is named in her official capacity, performing the non-exclusive duties of the Under Secretary for Industry and Security, as well as her successors and assigns.   The BIS is headquartered at 1401 Constitution Ave., NW, Room 2099B, Washington, DC 20230.

## JURISDICTION AND VENUE

17.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Due Process Clause of the United States Constitution and the ECRA.

18.     The Court also has jurisdiction pursuant to 28 U.S.C. § 2201 as there is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e)(1).

## STANDING

20.     FedEx has standing to bring this complaint against Defendants.   As stated above, FedEx cannot continue to operate without substantial risk of an impending injury resulting from enforcement actions.

21.     FedEx faces substantial criminal and civil penalties.   *See* ECRA § 1760(b) (criminal penalties of up to $1,000,000), (c) (civil penalties of $300,000 (or twice the value of the transaction) per individual violation) (50 U.S.C. § 4819(b), (c)).

22.     The credible threat of civil and criminal liability places FedEx between a rock and a hard place—absent the availability of review, FedEx must either forgo lawful activity because

of its well-founded fear of prosecution, or willfully violate the Export Controls, thereby subjecting itself to criminal prosecution and punishment.

23.     Indeed, FedEx has already suffered an injury-in-fact.  In 2017, the BIS charged FedEx with fifty-three violations of 15 C.F.R. § 764.2(b), despite already employing a sophisticated and proprietary risk-based compliance system.

## BACKGROUND

I.     THE EXPORT CONTROLS REGIME

A.     The EAR and its Statutory Underpinnings

24.     The EAR, enforced by the BIS, set out the U.S. Government's principal export control regime, restricting the international transfer of commodities, technology, information, and software for reasons of national security and foreign policy.

25.     The EAR were originally promulgated pursuant to the Export Administration Act of 1979 (Pub. L. 96-72) (the "*EAA*").  The EAA first expired in 1994 and was subsequently reauthorized.  During periods in which the EAA had lapsed, the EAR was kept in force by presidential emergency declarations pursuant to the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*, ("*IEEPA*").  The regime was reauthorized by the ECRA in 2018.

26.     The EAR control the exports, reexports (shipments or transmissions of items from one non-U.S. country to another non-U.S. country), and transfers (in-country) of "items subject to the EAR" by U.S. and foreign persons operating both inside and outside of the U.S.

27.     "Items subject to the EAR" include: (i) items exported from the U.S.; (ii) U.S.-origin items (manufactured in the United States); (iii) non-U.S. produced items that incorporate greater than *de minimis* levels of controlled U.S. content by value (with exceptions for certain

highly controlled content where any amount is sufficient); and (iv) certain foreign-made direct products of highly controlled U.S.-origin technology or software. *See* 15 C.F.R. § 732.

28.     The analysis required to make determinations under clauses (iii) and (iv) above is highly technical, and requires access to detailed information about the amount of U.S. controlled content contained within a given item and/or specific information about the technology or software used to create the item.

29.     The EAR penalize parties (including common carriers) for "[p]roceeding with transactions with knowledge that a violation [of the EAR] has occurred or is about to occur," including with respect to the mere transport or forwarding of packages. 15 C.F.R. § 736.2(10).

30.     The ECRA requires strict compliance with the EAR: "[n]o person may cause or aid, abet, counsel, command, induce, procure, or approve the doing of any act prohibited, or the omission of any act required by this title, the Export Administration Regulations, or any order, license or authorization issued thereunder." ECRA § 1760(a)(2)(B) (50 U.S.C. § 4819(a)(2)(B)).

31.     As noted above, the BIS may impose civil penalties for each individual violation of the EAR, which include: (i) fines; (ii) revocation of export licenses, and (iii) a prohibition on the person's ability to export, reexport, or in-country transfer any "items subject to the EAR." ECRA § 1760(c)(1) (50 U.S.C. § 4819(c)(1)).

32.     More specifically, the ECRA imposes significant civil and criminal penalties. *See* ECRA § 1760(b) (criminal penalties of up to $1,000,000), (c) (civil penalties of $300,000 (or twice the value of the transaction) per individual violation) (50 U.S.C. § 4819(b), (c)).

### B.     The BIS Entity List

33.     U.S. and foreign persons are required to comply with a wide variety of "General Prohibitions" regarding "items subject to the EAR," regardless of the items' location.  15 C.F.R.

§ 736. Among these prohibitions is General Prohibition Five, 15 C.F.R. § 736.2, which prohibits U.S. and foreign persons from knowingly exporting or reexporting "items subject to the EAR" to end-users or for end-uses that are prohibited by 15 C.F.R. § 744. Those end-users include persons on the Entity List, for whom all items subject to the EAR generally require a license. 15 C.F.R. § 744.16.

34. License applications to export, reexport, or transfer items subject to the EAR to persons on the Entity List are generally subject to a presumption of denial. *See* Supplement No. 4 to 15 C.F.R. § 744. In the context of General Prohibition Five's "knowingly" standard, "knowledge" is defined broadly to include "not only positive knowledge that the circumstance exists or is substantially certain to occur, but also an awareness of a high probability of its existence or future occurrence. Such awareness is inferred from evidence of the conscious disregard of facts known to a person and is also inferred from a person's willful avoidance of facts." 15 C.F.R. § 772.1.

### C. The CCL

35. The CCL is a list of items that trigger BIS export licensing requirements. General Prohibitions One, Two, and Three prohibit U.S. and foreign persons from exporting or reexporting without a license "items subject to the EAR" described on the CCL when the Commerce Country Chart indicates that exports or reexports to the destination country requires a BIS license. 15 C.F.R. § 736.2

### D. There is No Common Carrier Exception in the EAR

36. A common carrier holds itself out to the public as engaged in the business of transportation of person or property from place to place for compensation, offering its services to the public generally. Thus, the common carrier undertakes to carry for all people indifferently.

37.     In promulgating the EAR, the DOC did not include any exception for common carriers.

38.     Thus, common carriers that take possession of items for transport that could be subject to the EAR, without knowledge or the ability to know the jurisdictional status or export classification of these items, can be held liable if the carrier ships such items in violation of the EAR.

## II.     THE EXPORT CONTROL REGIME'S IMPACT ON FEDEX

### A.     FedEx's Burdens Under the Entity List

39.     The EAR effectively force FedEx to police the content of its packages in a manner it is not able to do.

40.     Even if FedEx were to inspect the contents of every package for reexport that it delivers, the company would not have enough information to make highly technical determinations to assess whether an item outside the U.S. is an "item subject to the EAR."

41.     For example, a computer brought to a FedEx location in Germany for shipment to Indonesia may incorporate greater than a *de minimis* level of U.S. controlled content by value, and thus be deemed an "item subject to the EAR" prohibited for reexport to Indonesian parties to the Entity List, or it may not.

42.     Even if FedEx could effectively examine every item tendered, this practice would curtail the public's interest in privacy.   In the reexport context, requiring FedEx to indiscriminately inspect every package abroad could place FedEx in violation of codified civil privacy laws.

**B.      The BIS Entity List Imposes an Overbroad, Disproportionate Burden on FedEx.**

43.      General Prohibition Five of the EAR profoundly impacts FedEx's non-U.S. operations.  FedEx cannot comply with the EAR without exceeding what is required by law, by refusing to ship packages to every person or entity on the Entity List, regardless of whether doing so would be unlawful.

44.      For example, although the EAR impose no restriction on the export of cameras (without requisite amounts of controlled U.S. content to be subject to the EAR) to an Entity List party, FedEx would be forced to forgo these shipments, because FedEx does not know whether or not the package contains "items subject to the EAR."  Thus, the regime would in practice force FedEx to forgo every export shipment to an Entity List party to ensure strict compliance with the EAR.

45.      A substantial portion of all FedEx international shipments transit through FedEx facilities in the U.S., including its logistical headquarters in Memphis, Tennessee, en route to their destinations.  These shipments, therefore, become "items subject to the EAR" while in transit.

46.      The DOC provides non-binding "guidance" relating to other provisions of the EAR.  The "Know Your Customer Guidance" states that, "absent 'Red Flags' (or an express requirement in the EAR), there is no affirmative duty upon exporters to inquire, verify, or otherwise 'go behind' the customer's representations."[3]  The lack of guidance, however, related to the obligations required of FedEx in order to comply with the BIS Entity List imposes an

---

[3] Know Your Customer Guidance, Bureau of Indus. & Sec. (2019),
https://www.bis.doc.gov/index.php/all articles/23 compliance-a-training/47-know-your-customer-guidance.

overbroad and disproportionate burden on FedEx.  Indeed, the same is true for the EAR licensing requirements to ship to certain countries based on the export classification of the product.

47.     The EAR regulations as applied to the BIS Entity List as its stands today, in effect, require FedEx to refuse a large share of its international shipments to guarantee it would not be subject to an enforcement action.

C.     **The EAR Impose an Overbroad, Disproportionate Burden on FedEx to Comply with Export Licensing Requirements Based on Country of Destination.**

48.     The inclusion of the CCL in the EAR also effectively forces FedEx to police the content of its packages on an almost infinitely broad scale.  Under General Prohibitions One, Two, and Three, U.S. and foreign persons are prohibited from exporting or reexporting "items subject to the EAR" that trigger BIS licensing requirements, unless such a license has been obtained.  *See* 15 C.F.R. 736.2(b)(1)-(3).

49.     These licensing requirements would apply to the shipper and also to FedEx.

50.     If a package FedEx ships to a foreign country contains any "item subject to the EAR" that is restricted for export to that country under the CCL, FedEx could be charged with violating General Prohibitions One, Two, or Three, as appropriate, because it would have engaged in a prohibited export or reexport.

51.     The only way for FedEx to even attempt to avoid inadvertently violating General Prohibitions One, Two, and Three would be to inspect the contents of every package tendered for shipment.  Alternatively, FedEx would have to cease shipping to listed entities in any of the more than 200 foreign jurisdictions on the Commerce Country Chart, which would make it unable to operate as a common carrier.

## III. THE BIS HAS ALREADY ENFORCED THE EAR AGAINST FEDEX

52. FedEx is presently operating under a settlement agreement with the BIS, entered into on April 23, 2018 (the "*Settlement Agreement*").

53. FedEx settled an administrative proceeding in which the BIS alleged that FedEx committed 53 violations of the EAR. Specifically, the BIS alleged that FedEx "caused, aided or abetted acts prohibited by the [EAR]" when it transported "items subject to the [EAR] . . . valued in total at approximately $58,091, from the United States to . . . France, or Pakistan, without the required BIS licenses." *See* Order Related to Federal Express Corporation d/b/a FedEx Express, ¶ 1, *In re Federal Express Corporation*, 17-BIS-0006 (Apr. 24, 2018).

54. The Settlement Agreement required that FedEx pay a civil penalty of $500,000, plus interest. Further, FedEx is required to "complete external audits of its export controls compliance program covering FedEx fiscal years 2017-2020." *Id*., Order at 4. This requires FedEx to hire a third party consultant "to conduct the external audits . . . with respect to all exports or reexports to parties on the BIS Entity List and Denied Persons List that are subject to the [EAR.]" *Id*. FedEx must report to the BIS where these audits "identify actual or potential violations of the Regulations." *Id*.

55. The Settlement Agreement further provides that "if FedEx should fail to pay the civil penalty in a full and timely manner or fail to complete any of the audits and submit the results in a full and timely manner, [the BIS] may issue an order denying all of FedEx's export privileges under the [EAR] for a period of one year . . . ." *Id.*

56. The penalties attendant to such agency enforcement actions are significant: the civil penalty in the Settlement Agreement was equivalent to an 860% premium on the value of the prohibited items.

## IV. THE BURDENS ON FEDEX RESULT FROM THE DOC'S FAILURE TO INCLUDE A COMMON CARRIER EXEMPTION IN THE EAR

57. Congress never imposed or authorized the imposition of an inspection regime on common carriers, likely because of the extraordinary burdens it would place on a common carrier like FedEx.

58. At all relevant times, FedEx is and was functioning as a common carrier.

59. The law shields internet service providers and telecommunications companies from certain liabilities because they are common carriers that merely provide a conduit for their customers to exchange communications in the marketplace.

60. Yet, the DOC promulgated the EAR without any safe harbor for common carriers like FedEx. As a result, the EAR impose a *de facto* duty to inquire. This is contrary to Congress's intent with respect to common carriers.

61. FedEx does know the identity of the shipper and the consignee. Accordingly, FedEx screens these parties before shipment and has the ability to stop any shipment to an entity on the Entity List.

62. However, because FedEx does not have the information necessary to determine whether the contents of the shipment are subject to the EAR, its risk-based compliance policies necessarily have traditionally prohibited all shipments destined for an Entity List consignee.

63. This is the only way FedEx can fulfill the compliance responsibilities arising from the addition of a party to the Entity List.

64. In the absence of any other means to address the requirements imposed by the EAR, FedEx is compelled to refrain from carrying out even lawful transactions. This result is damaging to FedEx's business.

## FIRST CAUSE OF ACTION
### (The Due Process Clause of the Fifth Amendment of the United States Constitution)

65.     Plaintiff FedEx incorporates by reference, as if fully restated herein, paragraphs 1 through 65 above.

66.     The Due Process Clause of the Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.

67.     The EAR, as applied to FedEx, are an unconstitutional infringement upon FedEx's substantive Due Process rights under the Fifth Amendment.

68.     Inherent in the powers granted to it by the Constitution, this Court is empowered to enjoin unconstitutional government acts.

69.     As the EAR now stand, FedEx is certain to find itself in violation of the EAR, and will suffer irreparable harm if forced to cease significant business operations in order to eliminate any risk of violation.

70.     It is practically impossible for the common carrier to comply with many of the EAR's prohibitions in many situations.

71.     The language of the EAR imposes a constitutionally unsupportable choice for FedEx.  Either FedEx can comply with the regulations as written, requiring it to cease all business operations that create a reasonable risk of violation according to the statute, or proceed with its business operations and face a substantial risk that it will violate the EAR and suffer harm.

72.     As a result, the EAR deprive FedEx of liberty and property by arbitrarily and irrationally precluding FedEx from carrying out the basic functions of its business as a common carrier.

73.     Accordingly, FedEx is entitled to a declaration that the EAR violate FedEx's constitutional Due Process rights, and an order permanently enjoining Defendants from enforcing provisions of § 736 of the EAR against FedEx, as necessary to address the concerns raised in this First Cause of Action.

**SECOND CAUSE OF ACTION**
**(Violation of Export Control Reform Act 2018)**

74.     Plaintiff FedEx incorporates by reference, as if fully restated herein, paragraphs 1 through 74 above.

75.     There is a well-established presumption favoring judicial review of administrative action.

76.     Even when a statute exempts agency action from administrative review under the Administrative Procedures Act, 5 U.S.C. §§ 500-596, 701 *et seq.*, judicial review is favored when an agency is charged with acting beyond its authority.

77.     Defendants' promulgation of the EAR as it now stands is an *ultra vires* agency action, subject to judicial review regardless of any statutory administrative review exemption.

78.     Defendants' own regulations (the EAR), are insufficient to expand the scope of their authority beyond that delegated by statute, *i.e.* the ECRA.

79.     Section 1752 of the ECRA sets forth, in paragraphs 1 through 10, the policy objectives of the ECRA.

80.     The primary policy of the U.S. under the ECRA is as follows:

> **To use export controls only after full consideration of the impact on the economy of the United States**, and **only to the extent necessary**—
>> (A) to restrict the export of items which would make a significant contribution to the military potential of any other country or combination of countries which would

prove detrimental to the national security of the United States; and

(B) to restrict the export of items if necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations.

ECRA § 1752(1) (50 U.S.C. § 4811(1)) (emphasis added).

81.     The ECRA also requires that the "export control system must ensure that it is predictable . . . ."  ECRA § 1752(8) (50 U.S.C. § 4811(8)).

82.     The ECRA restricts implementation and enforcement of the EAR "only in furtherance of all of the objectives set forth in paragraphs (1) through (10)."  ECRA § 1752(11) (50 U.S.C. § 4811(11)).

83.     The EAR's broad prohibition on aiding and abetting, without exception, exceeds Defendants' authority to use the export controls "only to the extent necessary" to protect the national security of the United States or further significantly its foreign policy.

84.     FedEx cannot realistically avoid violating the "aiding and abetting" provision of the EAR (15 C.F.R. § 764.2(b)).[4]

85.     The EAR also broadly provide that entities,

may not sell, transfer, export, reexport, finance, order, buy, remove, conceal, store, use, loan, dispose of, transport, forward, or otherwise service, in whole or in part, any item subject to the EAR and exported or to be exported **with knowledge** that a violation of the Export Administration Regulations, the Export Administration Act or any order, license, License Exception, or other authorization issued thereunder has occurred, is about to occur, or is intended to occur in connection with the item.

15 C.F.R. § 736.2(1) (emphasis added).

_____

[4] As noted above, this provision provides: "No person may cause or aid, abet, counsel, command, induce, procure, or permit the doing of any act prohibited, or the omission of any act required, by the EAA, the EAR, or any order, license or authorization issued thereunder."   15 C.F.R. § 764.2(b).

86.     The term "knowledge" is broadly defined in the EAR and includes awareness of a high probability that circumstances exist.  15 C.F.R. § 772.1; *supra*, ¶ 34.  This broad definition precludes any safe harbor for common carriers, like FedEx, for inadvertent violations of the EAR.

87.     This definition of "knowledge" is virtually guaranteed to capture unintentional violations of the EAR that FedEx could never sufficiently protect against.

88.     EAR Section 736.2 demonstrates that Defendants have acted outside the statutory authority granted to them by the ECRA, and their actions are thus subject to judicial review as *ultra vires* acts.

89.     Accordingly, FedEx is entitled to a declaration that the EAR are unlawful *ultra vires* agency actions, and an order permanently enjoining Defendants from enforcing provisions of § 736 of the EAR against FedEx, as necessary to address the concerns raised in this Second Cause of Action.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, FedEx Corporation, respectfully requests that the Court issue the following relief:

a)      An order granting permanent injunctive relief in favor of Plaintiff and against Defendants that prohibits Defendants from enforcing § 736 the EAR against Plaintiff, as necessary to address the concerns raised in this Complaint;

b)      Declare that the EAR are unlawful as applied to Plaintiff;

c)      Award Plaintiff its costs and expenses, including reasonable attorneys' fees; and

d)      Award such further and additional relief as is just and proper.

Dated:  June 24, 2019

Respectfully submitted,

By: _____/s/_____

Maurice A. Bellan
DC Bar No. 992051
maurice.bellan@bakermckenzie.com

Kenneth P. Quinn
DC Bar No. 495423
*Admission Request Forthcoming*
kenneth.quinn@bakermckenzie.com

Kimberly F. Rich
Texas Bar No. 24010344
*Pro Hac Vice Application Forthcoming*
kimberly.rich@bakermckenzie.com

BAKER & McKENZIE LLP
815 Connecticut Avenue NW
Washington, DC 20006
Tel:  (202) 452-7057
Fax: (202) 416-7024

*Attorneys for Plaintiff, FedEx Corporation*