# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

FedEx Corporation,

      Plaintiff,

  v.

U.S. Department of Commerce, *et al.*,

      Defendants.

Civil Action No. 1:19-cv-1840 (JDB)

## DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Defendants United States Department of Commerce, *et al.*, respectfully move to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and Local Civil Rule 7. The reasons for this motion are set forth in the attached Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss the Complaint and Exhibits. A proposed order is attached as well.

Dated: September 10, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director

*/s/ Matthew Skurnik*
MATTHEW SKURNIK (NY 5553896)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005

Tel: (202) 616-8188
Email: Matthew.Skurnik@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FedEx Corporation, | |
| Plaintiff, | |
| v. | Civil Action No. 1:19-cv-1840 (JDB) |
| U.S. Department of Commerce, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

    I.      Statutory And Regulatory Background ....................................................... 3

          a.    The Export Administration Regulations ......................................... 3

          b.    Statutory Authority For The EAR.................................................... 5

    II.     This Lawsuit................................................................................................ 8

STANDARDS OF REVIEW ................................................................................ 11

    I.      Rule 12(b)(1)............................................................................................. 11

    II.     Rule 12(b)(6)............................................................................................. 11

ARGUMENT ....................................................................................................... 12

    I.      FedEx's Substantive Due Process Claim Should Be Dismissed. ............. 12

    II.     FedEx's ECRA Claim Should Be Dismissed. ......................................... 16

          a.    FedEx's ECRA Claim Raises A Non-Justiciable Political
               Question. ....................................................................................... 18

          b.    ECRA Precludes Jurisdiction Over FedEx's
               Claim.............................................................................................. 22

               i.    The Narrow *Ultra Vires* Exception Does Not
                     Apply............................................................................... 25

                    1.    ECRA Expressly Precludes Judicial Review............ 25

                    2.    FedEx Has Not Alleged A Patent Violation Of ECRA
                        ............................................................................. 27

          c.    FedEx Fails To State A Claim For Violation Of ECRA............... 31

CONCLUSION..................................................................................................... 31

# TABLE OF AUTHORITIES

<u>CASES</u>

*Am. Fed'n of Gov't Employees, AFL-CIO v. United States*,
   330 F.3d 513 (D.C. Cir. 2003) ................................................................... 12

*Amgen, Inc. v. Smith*,
   357 F.3d 103 (D.C. Cir. 2004) ................................................................... 27

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................... 11, 12, 31

*Atherton v. D.C. Office of Mayor*,
   567 F.3d 672 (D.C. Cir. 2009) ................................................................... 11

*Baker v. Carr*,
   369 U.S. 186 (1962) ................................................................... 18, 19, 21, 22

*Barr v. Clinton*,
   370 F.3d 1196 (D.C. Cir. 2004) ................................................................... 11

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*,
   502 U.S. 32 (1991) ................................................................... 26, 27

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................... 11

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984) ................................................................... 23

*Boumediene v. Bush,*
   553 U.S. 723 (2008) ................................................................... 15

*Bowen v. Gilliard*,
   483 U.S. 587 (1987) ................................................................... 15

*Dart v. United States*,
   848 F.2d 217 (D.C. Cir. 1988) ................................................................... *passim*

*DCH Reg'l Med. Ctr. v. Azar*,
   925 F.3d 503 (D.C. Cir. 2019) ................................................................... 25, 30

*Dep't of Army v. Blue Fox, Inc.*,
   525 U.S. 255 (1999) ................................................................... 23

*El–Shifa Pharm. Indus. Co. v. United States*,
   607 F.3d 836 (D.C. Cir. 2010) ................................................................... 18, 21

*Empresa Cubana Exportadora de Alimentos y Productos Varios v.*
   *U.S. Dep't of Treasury*,
   638 F.3d 794 (D.C. Cir. 2011) ..................................................................... 12

*F.C.C. v. Beach Comm'ns, Inc.*,
   508 U.S. 307 (1993) ........................................................................... 12, 13

*Fla. Health Sci. Ctr. v. Sec'y of Health & Human Servs.*,
   830 F.3d 515 (D.C. Cir. 2016) ..................................................................... 28

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) ............................................................. 12, 13

*Gunn v. Minton*,
   133 S. Ct. 1059 (2013) ................................................................................. 22

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) ................................................................................ 13, 31

*Karn v. U.S. Dep't of State*,
   925 F. Supp. 1 (D.D.C. 1996) ....................................................... 14, 16, 22

*Khadr v. United States*,
   529 F.3d 1112 (D.C. Cir. 2008) ................................................................... 11

*Knapp Med. Ctr. v. Hargan*,
   875 F.3d 1125 (D.C. Cir. 2017) ................................................................... 23

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
   511 U.S. 375 (1994) ..................................................................................... 11

*Leedom v. Kyne*,
   358 U.S. 184 (1958) .............................................................................. 25, 31

*McBryde v. Comm. to Review Circuit Council Conduct & Disability*
   *Orders of Judicial Conference of U.S.*,
   264 F.3d 52 (D.C. Cir. 2001) ...................................................................... 27

*Mercy Hosp., Inc. v. Azar*,
   891 F.3d 1062 (D.C. Cir. 2018) ................................................................... 23

*Nachman Corp. v. Pension Ben. Guar. Corp.*,
   592 F.2d 947 (7th Cir. 1979) ...................................................................... 15

*Nat'l Ass'n of Recycling Indus., Inc. v. Sec'y of Commerce*,
   494 F. Supp. 158 (D.D.C. 1980) ................................................................. 14

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ............................................................ 25, 30

*Organogenesis, Inc. v. Sebelius*,
    41 F. Supp. 3d 14 (D.D.C. 2014) ........................................................ 28, 29

*People's Mojahedin Org. of Iran v. U.S. Dep't of State*,
    182 F.3d 17 (D.C. Cir. 1999) .................................................................... 19

*Porter v. CIA*,
    778 F. Supp. 2d 60 (D.C. Cir. 2011) ......................................................... 11

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
    758 F.3d 296 (D.C. Cir. 2014) .................................................................. 19

*Ralpho v. Bell*,
    569 F.2d 607 (D.C. Cir. 1977) .................................................................. 23

*Regan v. Wald*,
    468 U.S. 222 (1984) ................................................................................. 16

*Romer v. Evans*,
    517 U.S. 620 (1996) ................................................................................. 15

*Rostker v. Goldberg*,
    453 U.S. 57, 101 S. Ct. 2646, 69 L.Ed.2d 478 (1981) ................................. 16

*Schneider v. Kissinger*,
    412 F.3d 190 (D.C. Cir. 2005) ...................................................... 18, 21, 22

*Schroer v. Billington*,
    525 F. Supp. 2d 58 (D.D.C. 2007) ........................................................... 25

*Sheldon v. Sill*,
    49 U.S. 441 (1850) ................................................................................... 22

*Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*,
    549 U.S. 422 (2007) ................................................................................. 11

*Speelman v. United States*,
    461 F. Supp. 2d 71 (D.D.C. 2006) ........................................................... 11

*Trane Co. v. Baldrige*,
    552 F. Supp. 1378 (W.D. Wis. 1983) ....................................................... 14

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) .................................................................. 25

iv

*United States v. Atl. Research Corp.*,
   551 U.S. 128 (2007)................................................................................. 29

*United States v. Helmy*,
   712 F. Supp. 1423 (E.D. Cal. 1989)......................................................... 21

*United States v. Mandel*,
   914 F.2d 1215 (9th Cir. 1990) .................................................................. 20

*United States v. Martinez*,
   904 F.2d 601 (11th Cir. 1990) .................................................................. 21

*United States v. Mechanic*,
   809 F.2d 1111 (5th Cir. 1987) .................................................................... 6

*United States v. Moller-Butcher*,
   560 F. Supp. 550 (D. Mass. 1983) ........................................................... 21

*Vance v. Bradley*,
   440 U.S. 93 (1979)............................................................................. 13, 15

*Washington v. Glucksberg*,
   521 U.S. 702 (1997)................................................................................. 12

*Wisconsin Project on Nuclear Arms Control v. Dep't of Commerce*,
   317 F.3d 275 (D.C. Cir. 2003) ................................................................... 6

## STATUTES

5 U.S.C. § 702......................................................................................... 7, 23

21 U.S.C. § 822(c) .............................................................................. 15, 29

47 U.S.C. § 230(c)(1)......................................................................... 15, 29

50 USC § 1701........................................................................................... 6

50 U.S.C. § 2402...................................................................................... 20

50 U.S.C. § 2412(a) (repealed) ..................................................... 8, 26, 30

50 U.S.C. § 4601........................................................................................ 5

Export Control Reform Act of 2018,
   50 U.S.C. § 4801 *et seq.*........................................................................... 6

50 U.S.C. § 4801................................................................................ 6, 7, 23

50 U.S.C. § 4811................................................................................ *passim*

50 U.S.C. § 4813(a) ........................................................................................... 7, 24, 29

50 U.S.C. § 4819 ..................................................................................................... 7, 24

50 U.S.C. § 4821 ........................................................................................... 7, 23, 25, 26

50 U.S.C. § 4826 ........................................................................................... 6, 7, 23, 28

50 U.S.C. §§ 4841–43 ..................................................................................................... 7

Act of Nov. 13, 2000,
    Pub. L. No. 106-508, 114 Stat. 2360 ........................................................................ 6

National Defense Authorization Act for Fiscal Year 2019,
    Pub. L. 115–232, 132 Stat. 1636 (2018) .................................................................. 6

<u>REGULATIONS</u>

15 C.F.R. pt. 736 ........................................................................................................... 4

15 C.F.R. pts. 730–774 .................................................................................................. 3

15 C.F.R. § 730.3 ........................................................................................................... 4

15 C.F.R. § 730.6 ............................................................................................... 1, 3, 13

15 C.F.R. §§ 734.13–734.16 .......................................................................................... 4

15 C.F.R. § 734.2 ........................................................................................................... 4

15 C.F.R. § 736 ............................................................................................................ 10

15 C.F.R. § 736.2 ....................................................................................................... 4, 5

15 C.F.R. § 738.2(d)(2)(ii)(A) ...................................................................................... 5

15 C.F.R. § 744.16 ......................................................................................................... 5

15 C.F.R. § 764.2(b) ...................................................................................................... 5

15 C.F.R. § 772.1 ...................................................................................................... 5, 14

Entity List,
    15 C.F.R. pt. 744, Supp. No. 4 ................................................................................ 5

Commerce Control List,
    15 C.F.R. pt. 774, Supp. No. 1 ................................................................................ 4

Entity List,
  62 Fed. Reg. 4,910 (Feb. 3, 1997) .................................................................. 5

India and Pakistan Sanctions and Other Measures,
  63 Fed. Reg. 64,322 (Nov. 19, 1998)................................................................ 9

Exec. Order No. 13,222,
  66 Fed. Reg. 44,025 (August 17, 2001) ....................................................... 6

General Order Concerning Mayrow General Trading and Related Entities,
  71 Fed. Reg. 32,272 (Jun 5, 2006)................................................................ 10

Addition of Certain Persons on the Entitity List,
  76 Fed. Reg. 37,632 (June 28, 2011) ............................................................ 9

<u>OTHER AUTHORITIES</u>

H.R. Conf. Rep. No. 5515, 115th Cong., 2d Sess. 1079 (2018) ................................. 28, 29

"FedEx, in another error, misses delivery of Huawei package to US,"
  CNBC (June 23, 2019) ............................................................................... 8-9

## INTRODUCTION

The Export Administration Regulations ("EAR") are a broad set of export controls administrated by the Department of Commerce "intended to serve the national security, foreign policy, nonproliferation of weapons of mass destruction, and other interests of the United States." 15 C.F.R. § 730.6.  The EAR govern exports not just of traditional goods and commodities, but also of software and technology.  The EAR set out requirements based upon the type of item involved, the country and party to which the item is being exported, and the intended end use of the item.  The EAR have existed for decades, and today serve as critical tools of both national security and foreign policy.

In this lawsuit, FedEx Corporation has challenged the application of the EAR to itself and companies like it—entities in the business of shipping packages and freight around the world. According to the complaint, compliance with the EAR has caused FedEx a significant economic burden, and has threatened some of its business.  FedEx contends that to apply the regulations to companies like itself is not "necessary" to serve the national security and foreign policy interests of the United States, and asks the Court to endorse that conclusion.  It further argues that the regulations have violated its substantive due process rights by impacting its business.

FedEx's complaint is a policy preference in search of a legal claim.  The company believes that it should be exempt from the EAR based on the apparent premise that Congress should have shielded it from certain potential liabilities, as Congress allegedly has done with regard to internet services providers under the telecommunications laws.  But FedEx has turned to the courts for relief, not Congress.  And here, the two claims it asserts fall well short of what is required to get past the pleading stage or invoke this Court's jurisdiction.

At the outset, FedEx's substantive due process claim does not involve a fundamental right. Thus, under well-established principles, the EAR are subject only to rational basis scrutiny, which they clearly and easily satisfy. The EAR are rationally related to the Government's legitimate national security and foreign policy interests, and the same is true for applying the EAR to entities like FedEx. Requiring FedEx and similar companies to comply with the EAR incentivizes such companies to monitor their shipments, thus making it less likely that violations of the EAR will occur. FedEx has failed to state a colorable claim under the Fifth Amendment, and its substantive due process claim should be dismissed.

FedEx's statutory claim faces more fundamental hurdles. The premise of the claim is that the EAR are inconsistent with a statement in the policy section of their organic statute—the Export Control Reform Act ("ECRA")—which provides that export controls must be "necessary" to serve national security and foreign policy interests. But whether particular export controls are "necessary" to serve such interests is the type of political question that is reserved to the Executive and Legislative Branches and outside the jurisdiction of this Court. When faced with a nearly identical provision in a predecessor statute, the Ninth Circuit applied the political-question doctrine and concluded that it lacked jurisdiction. The Court should do the same here.

Even if the statutory claim did not raise a political question, review still would not be warranted. A different provision in ECRA expressly precludes judicial review, providing a separate ground for why this Court lacks jurisdiction. Seemingly in recognition of this fact, FedEx pleads it statutory claim as one for *ultra vires* review—a form of review available only in exceedingly rare circumstances. Unsurprisingly, such circumstances are not present here. *Ultra vires* review requires a clear and patent violation of a statutory command, and FedEx's allegation of inconsistency with a generalized policy objective cannot satisfy that standard.

Nor does the allegation itself have merit.  The complaint does not include a single allegation about why the EAR are not "necessary" to serve national security and foreign policy interests, leaving only conclusory statements that the statute has been violated.  More generally, the regulations FedEx challenges preexisted ECRA, and when ECRA was enacted, the statute included a "transition provision" stating that the regulations shall continue in effect according to their terms until later modified or revoked.  In other words, the statute FedEx claims is inconsistent with the EAR contains a provision expressly stating that it is not.  Accordingly, FedEx has neither demonstrated a patent statutory violation nor satisfied basic pleading standards.  Its statutory claim should be dismissed.

For these reasons, set forth further below, the Court should dismiss FedEx's complaint.

## BACKGROUND

### I.    Statutory And Regulatory Background

#### a.   The Export Administration Regulations

The United States Department of Commerce, through its Bureau of Industry and Security ("BIS"), plays a primary role in administering and enforcing the nation's export control system. In fulfilling this task, BIS relies on several different statutory and regulatory regimes, the most significant of which are the Export Administration Regulations ("EAR").  15 C.F.R. pts. 730–774. The EAR are a wide-ranging set of export controls "intended to serve the national security, foreign policy, nonproliferation of weapons of mass destruction, and other interests of the United States, which in many cases are reflected in international obligations or arrangements." *Id.* § 730.6.  Some provisions of the EAR are "designed to restrict access to items . . . by countries or persons that might apply such items to uses inimical to U.S. interests," including "controls designed to stem the proliferation of weapons of mass destruction and controls designed to limit the military and

terrorism support capability of certain countries." *Id.* In order to accomplish its goals, the EAR regulate based on several different factors, including the type of item at issue, the foreign country involved, the entity involved, and the intended end-use of the item. *See, e.g., id.* § 736.2.

Subject to certain exceptions, the EAR apply to all U.S.-origin items—including goods, software, and technology—that are not otherwise regulated under U.S law by a different agency or export control regime. *Id.* § 730.3. "Items subject to the EAR," *id.* § 734.2, include "purely civilian items, items with both civil and military, terrorism or potential WMD-related applications, and items that are exclusively used for military applications but that do not warrant control" under a separate export control regime, *id.* § 730.3.

With respect to "items subject to the EAR," the regulations set forth potentially impermissible activities, including "exports" (the shipment or transmission of an item out of the United States or the release of technology to a foreign person); "reexports" (the shipment or transmission of a U.S.-origin item from one foreign country to another or the release of U.S.-origin technology by a foreign person of one country to a foreign person of another country); and "in-country transfers" (a change in end use or end user of a U.S.-origin item within the same foreign country). *Id.* §§ 734.13–734.16. For many items, the EAR prohibit U.S. and foreign persons from engaging in exports, reexports, and in-country transfers unless the person first obtains a license from BIS. *See id.* pt. 736 (General Prohibitions).

Of the items subject to the EAR, the most sensitive are identified on a list called the Commerce Control List. *See* 15 C.F.R. pt. 774, Supp. No. 1. The Commerce Control List explains, for each sensitive category of items, the license requirements for exporting, re-exporting, or transferring (in-country) the items with respect to various countries, the circumstances in which a person is exempt from obtaining a license, and the reasons why the items are regulated. *See id.*

Such reasons for control include "Anti-Terrorism"; "Chemical & Biological Weapons"; "Missile Technology"; "National Security"; "Nuclear Nonproliferation"; "United Nations Embargo"; "Crime Control"; and "Regional Stability", among others.   *Id.* § 738.2(d)(2)(ii)(A).

In addition to the Commerce Control List, BIS also maintains the "Entity List", which identifies foreign persons "reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States." *Id.* § 744.16; *see also* 62 Fed. Reg. 4,910 (initially establishing the Entity List). In general, it is unlawful to export, reexport, or perform an in-country transfer of items to an entity on the Entity List without a license.  *See* 15 C.F.R. pt. 744, Supp. No. 4.

The EAR broadly prohibit proceeding with a transaction with knowledge that a violation of the regulations has occurred or is about to occur.  *Id.* § 736.2(b)(10) (General Prohibition 10). Knowledge is defined as "not only positive knowledge that the circumstance exists or is substantially certain to occur, but also an awareness of a high probability of its existence or future occurrence.  Such awareness is inferred from evidence of the conscious disregard of facts known to a person and is also inferred from a person's willful avoidance of facts." *Id.* § 772.1.  The EAR also prohibit aiding or abetting violations of the regulations.  *See* § 764.2(b) ("No person may cause or aid, abet, counsel, command, induce, procure, or permit the doing of any act prohibited, or the omission of any act required, by . . . the EAR, or any order, license or authorization issued thereunder.").

### b.  Statutory Authority For The EAR

Controls on the export of sensitive items have been in place continuously since at least 1942.  *See, e.g.*, Act of June 30, 1942, ch. 461, 56 Stat. 463.  During much of this period, the Commerce Department's authority to issue and maintain controls such as the EAR has been

grounded in the Export Administration Act of 1979 or its predecessor statutes.  50 U.S.C. § 4601 *et seq.*  However, the Export Administration Act of 1979 lapsed several times, most recently in August 2001.  *See* Act of Nov. 13, 2000, Pub. L. No. 106-508, 114 Stat. 2360 (reviving EAA until Aug. 20, 2001).  During periods when the Export Administration Act of 1979 was in lapse, the EAR were continued in force through Executives Orders issued under the International Emergency Economic Powers Act ("IEEPA"), 50 USC § 1701 *et seq.  See, e.g.*, Exec. Order No. 13,222, 66 Fed. Reg. 44,025 (August 17, 2001) (continuing EAR in force under IEEPA); *see also Wisconsin Project on Nuclear Arms Control v. Dep't of Commerce*, 317 F.3d 275 (D.C. Cir. 2003) (upholding, as a general matter, practice of continuing the EAR under IEEPA); *United States v. Mechanic*, 809 F.2d 1111, 1113 (5th Cir. 1987) (affirming criminal convictions under regulations adopted pursuant to the Export Administration Act when the acts alleged in the indictment were committed during a period in which the Export Administration Act had lapsed).

Recently, as part of the National Defense Authorization Act for Fiscal Year 2019 ("2019 NDAA"), Pub. L. 115–232, 132 Stat. 1636 (2018), Congress passed the Export Control Reform Act of 2018 ("ECRA").  *See* 50 U.S.C. § 4801 *et seq.*, 132 Stat. at 2208.  Among other things, ECRA repeals nearly all of the long-lapsed Export Administration Act of 1979, and provides a new statutory authority for the EAR.  *See* ECRA § 1766(a), 132 Stat. at 2232 (repealing nearly all of the Export Administration Act); *see generally* 50 U.S.C. §§ 4801–4826 (granting authorities to the President, Secretary of Commerce, and other officials to promulgate and administer export controls).  In particular, the act confers on the Secretary of Commerce the authority to, among other things, (1) "establish and maintain a list" of controlled items (*i.e.*, the Commerce Control List) and to "prohibit unauthorized exports, reexports, and in-country transfers" of such items; (2) "establish and maintain a list of foreign persons and end-uses that are determined to be a threat to

6

the national security and foreign policy of the United States" (*i.e.*, the Entity List) and to "restrict exports, reexports, and in-country transfers" of controlled items to foreign persons or for end-uses on that list; (3) "require licenses or other authorizations" for exports, reexports, and in-country transfers of controlled items; and (4) "undertake any other action as is necessary to carry out [the relevant] subchapter that is not otherwise prohibited by law." *Id.* § 4813(a).

ECRA defines "Export Administration Regulations" to include both (1) the EAR as it existed on the day ECRA was enacted; as well as (2) any future regulations "that are promulgated, maintained, and amended" under the authority of ECRA after the date of its enactment. *Id.* § 4801(4). In a section titled "Transition provisions," ECRA also makes clear that all "delegations, rules, regulations, orders, determinations, licenses, or other forms of administrative action" that have been "made, issued, conducted, or allowed to become effective" under the Export Administration Act (as continued under IEEPA), or under the EAR, "shall continue in effect according to their terms until modified, superseded, set aside or revoked under the authority" set forth in ECRA. *Id.* § 4826(a).

Finally, in a section titled "Administrative Procedure," ECRA provides that the "functions exercised under" its principle subchapter[1] shall not be subject to most provisions of the Administrative Procedures Act ("APA"), including the entitlement to judicial review found in the APA's section 702. *See* 50 U.S.C. § 4821(a) ("Except as provided in [certain unrelated provisions[2]], the functions exercised under this subchapter shall not be subject to sections 551, 553

---

[1] The other subchapters of ECRA relate to "anti-boycott" controls, *see* 50 U.S.C. §§ 4841–43, and an undersecretary and two assistant secretary positions, §§ 4851–52, none of which are relevant to the instant dispute.

[2] The primary exception to the inapplicability of the APA to functions exercised under the relevant subchapter is with respect to the procedures governing civil penalty hearings before an Administrative Law Judge. *See* 50 U.S.C. §§ 4819(c)(2), 4821(a), 4843(c).

through 559, and 701 through 706 of Title 5."); *see also* 5 U.S.C. § 702 (granting "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action," an entitlement to "judicial review thereof").  In other words, this provision withdraws the APA's conferral of jurisdiction to perform judicial review of agency action as to "functions exercised under" ECRA's relevant subchapter.  This clause mirrors a nearly identical preclusion-of-jurisdiction provision found in the now-repealed Export Administration Act.  *See* 50 U.S.C. § 2412(a) (repealed) ("Except as provided in [certain unrelated provisions], the functions exercised under this chapter are excluded from the operation of sections 551, 553 through 559, and 701 through 706 of Title 5.").

## II.     This Lawsuit

On June 24, 2019, Plaintiff FedEx Corporation ("FedEx") filed this lawsuit against the federal government.  Compl. ¶ 1, ECF No. 1.  According to the complaint, FedEx is a "global business that provides its customers with transportation, e-commerce, and business solutions," including "time-sensitive, air-ground express service that ships packages for customers worldwide."  *Id.* ¶ 2.  FedEx alleges that, although it utilizes a "sophisticated proprietary risk-based compliance system" to "screen[] the names and addresses of its shippers and the designated recipients prior to delivering any package," it is unable to perform the extent of screening it claims is required under the EAR.  *Id.* ¶ 5–6.  In particular, FedEx claims that it is required to inspect the contents of the packages it ships, but is unable to do so.  *Id.* ¶ 8.  FedEx alleges that, as a result, it has suffered economic burdens and must choose between "operat[ing] under threat of imminent enforcement actions, or ceas[ing] operations that may conceivably lead to enforcement and

fac[ing] possible legal consequences from customers and foreign governments."[3]  *Id.* ¶ 10.  Despite alleging that it receives approximately 15 million packages a day for shipment, *id.* ¶ 3, FedEx asserts that it is "compelled to refrain from carrying out even lawful transactions," *id.* ¶ 64.

In its complaint, FedEx discusses an agreement reached with BIS in April 2018 to settle charges that FedEx had violated the EAR.  *Id.* ¶ 52–56.  The charges related to 53 different instances in which FedEx shipped unlicensed items subject to the EAR to either the French company Aerotechnic France SAS ("Aerotechnic")[4] or the Pakistan Institute for Nuclear Science and Technology ("PINSTECH"),[5] both of which are listed on the Entity List for engaging in activities contrary to U.S. national security or foreign policy interests.  *See* Order, Settlement, and Charging Letter, 17-BIS-6, attached hereto as Exh. A.  As alleged by BIS, a license was required to export any item subject to the EAR to Aerotechnic or PINSTECH, and exporters had provided FedEx with shipping and delivery information that should have enabled FedEx to readily determine that Aerotechnic and PINSTECH were the recipients and listed on the Entity List.  *Id.* FedEx's proprietary compliance system nonetheless failed to make that determination, even

---

[3] The complaint does not identify any particular customer or foreign government. However, this lawsuit was filed shortly after extensive press coverage concerning a dispute between FedEx and a foreign company.  *See, e.g.*, "FedEx, in another error, misses delivery of Huawei package to US," CNBC (June 23, 2019) (available at https://www.cnbc.com/2019/06/23/fedex-in-another-error-misses-delivery-of-huawei-package-to-us.html).

[4] Aerotechnic was added to the Entity List "based on evidence that [it had] engaged in actions that could enhance the military capability of Iran, a country designated by the U.S. Secretary of State as having repeatedly provided support for acts of international terrorism . . . [and] because [its] overall conduct pose[d] a risk of ongoing EAR violations." 76 Fed. Reg. 37,632 (June 28, 2011); Exh. A.  Some of the items exported to Aerotechnic were controlled on Anti-Terrorism grounds.  *See* Exh. A.

[5] PINSTECH is a subordinate entity of the Pakistan Atomic Energy Commission.  It was added to the Entity List—along with a number of other Pakistani government (and parastatal and private) entities, all of which were involved in nuclear or missile activities—shortly after Pakistan detonated a nuclear device.  *See* 63 Fed. Reg. 64,322 (Nov. 19, 1998); Exh. A.

though the recipients' names and addresses were identical or nearly-identical to those on the Entity List.[6] *Id.* FedEx neither admitted nor denied the allegations, but ultimately agreed during litigation to pay a $500,000 civil penalty and to hire a third-party consultant to conduct audits of its export control compliance system for the period of 2017 to 2020. *Id*. The instant complaint does not seek to challenge this settlement agreement itself, and concedes that FedEx "has the ability to stop any shipment to an entity on the Entity List." Compl. ¶ 61.[7]

FedEx raises two claims: in Count I, it alleges that the EAR violates FedEx's "substantive Due Process rights under the Fifth Amendment;" and in Count II, it alleges that "promulgation of the EAR as it now stands is an *ultra vires* agency action" inconsistent with ECRA. *Id*. ¶¶ 67, 77. FedEx seeks both declaratory relief and to enjoin Defendants from enforcing § 736 of the EAR against FedEx. Section 736 serves as a summary roadmap of prohibited conduct under the EAR, by setting forth general prohibitions in a single section and providing cross-references to other sections of the EAR that provide operative detail concerning the exports, re-exports, and in country transfers or other related activities that are prohibited absent a license from BIS. 15 C.F.R. § 736.

---

[6] For example, FedEx failed to flag numerous transactions where the recipient was identified as "Aerotechnic France," and, in addition, the address information (street name, building number, city, and postal zip code) matched or nearly matched the address information listed for "Aerotechnic France SAS" on the Entity List. *See* Exh. A.

[7] FedEx previously entered into a separate settlement with BIS in December 2011, for causing, aiding, or abetting the export or attempted export of items subject to the EAR to a Chinese entity on the Entity List; to Syria, a destination subject to a comprehensive embargo; and to Mayrow General Trading Company, of Dubai, United Arab Emirates. Mayrow was the subject of General Order No. 3, which BIS issued due to the U.S. Government's determination that Mayrow had acquired, and was continuing to acquire, U.S.-made electronics components for use in improvised explosive devices, or "IEDs", in Iraq and Afghanistan. *See* Order, Settlement, and Charging Letter, 11-BIS-3, attached hereto as Exh. B; *see also* 71 Fed. Reg. 32272 (Jun 5, 2006).

## STANDARDS OF REVIEW

### I.    Rule 12(b)(1)

Motions brought pursuant to Rule 12(b)(1) challenge whether the district court has jurisdiction over the action.  *See* Fed. R. Civ. P. 12(b)(1).  "Federal courts are courts of limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), and a party claiming subject matter jurisdiction bears the burden of demonstrating that such jurisdiction exists, *Khadr v. United States*, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  Although a court must give the plaintiff the benefit of inferences that can be derived from the facts alleged in the complaint, *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004), "the Court need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions," *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006) (citation omitted).  When a defendant raises an issue of subject matter jurisdiction under Rule 12(b)(1), the Court must resolve the jurisdictional issue before it proceeds to the merits of the plaintiff's claims.  *See, e.g., Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007).

### II.    Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The Court will ordinarily "accept as true all of the factual allegations contained in the complaint," *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (citation omitted), and construe the allegations in the plaintiff's favor, *Porter v. CIA*, 778 F. Supp. 2d 60, 65 (D.C. Cir. 2011).  However, "the tenet that a court must accept as true all

11

of the allegations contained in a complaint is inapplicable to legal conclusions" or to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

## ARGUMENT

### I.    FedEx's Substantive Due Process Claim Should Be Dismissed.

The substantive component of the Fifth Amendment's Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests," such as "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citations omitted). Where, however, a regulation does not infringe upon a fundamental right, "judicial scrutiny under the substantive due process doctrine is highly deferential." *Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury*, 638 F.3d 794, 800 (D.C. Cir. 2011) (citations omitted). The challenged regulation "bear[s] a strong presumption of validity, *F.C.C. v. Beach Comm'ns, Inc.*, 508 U.S. 307, 314 (1993), and courts ask only whether the regulation is rationally related to a legitimate government interest, *see Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 330 F.3d 513, 523 (D.C. Cir. 2003) ("Absent a suspect classification or infringement of a fundamental interest, the Fifth Amendment requires only a rational basis." (citation omitted)).

To sustain a substantive due process claim in such circumstances, the plaintiff must show "that there is no rational relationship between [the regulation] and some legitimate governmental purpose." *Gordon v. Holder*, 721 F.3d 638, 656 (D.C. Cir. 2013) (citation omitted). "This burden to negative every conceivable basis which might support the [regulation] is especially difficult to meet." *Id.* (citation omitted). The basis for the regulation "is not subject to courtroom fact-finding

and may be based on rational speculation unsupported by evidence or empirical data." *Beach Comm'ns*, 508 U.S. at 315.  Even if the assumptions underlying the rationales are erroneous, the very fact that they are arguable is sufficient, on rational-basis review, to sustain the regulation. *Vance v. Bradley*, 440 U.S. 93, 112 (1979).

Here, FedEx asserts purely economic burdens from the EAR—that the regulations "preclud[e]" FedEx from "carrying out the basic functions of its business."  Compl. ¶ 72. Accordingly, FedEx's claim triggers only rational basis review, a standard which the EAR easily satisfy.

As an initial matter, FedEx's complaint itself identifies a rational basis for the EAR.  It explains that the EAR "restrict[] the international transfer of commodities, technology, information, and software for reasons of national security and foreign policy." *Id.* ¶ 24.  Provisions in the EAR confirm this basis, explaining that the regulations serve "the national security, foreign policy, nonproliferation of weapons of mass destruction, and other interests of the United States." 15 C.F.R. § 730.6.

Promoting national security and foreign policy interests obviously are legitimate government purposes. *See, e.g.*, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010) (recognizing the Government's "sensitive and weighty interests of national security and foreign affairs").  Further, placing controls on the export, re-export, and transfer of sensitive or potentially dangerous items clearly is rationally related to promoting those interests.  Such controls help prevent foreign adversaries, whether hostile nations, sponsors of terrorism, or agents of foreign intelligence services, from obtaining the weapons, technology, parts, and materials that might prove to the detriment of U.S. security and foreign policy interests.  For these reasons, courts routinely reject substantive due process challenges to export controls. *See, e.g.*, *Karn v. U.S. Dep't*

*of State*, 925 F. Supp. 1, 13 (D.D.C. 1996) (rejecting substantive due process challenge to export controls on cryptographic software because "[t]he government clearly has an interest in preventing the proliferation of cryptographic software to foreign powers, and the regulation of the export of the cryptographic software is a rational means of achieving that goal").[8]

FedEx asserts that it is arbitrary and irrational to apply the EAR to a company like itself—what the EAR terms a "forwarding agent."[9]  Compl. ¶ 72.  But requiring forwarding agents like FedEx to adhere to the EAR promotes compliance with the EAR generally, and therefore reduces the extent to which sensitive and dangerous items reach potential bad actors.  It is inevitable that some exporters, intentionally or not, will attempt to ship items prohibited by the EAR, and requiring intermediaries to comply with the regulations makes it less likely that such attempts will be successful.  Promoting compliance with export controls is plainly a rational basis for applying the EAR to forwarding agents—particularly so with respect to massive ones like FedEx, *see* Compl. ¶ 3 ("FedEx receives approximately fifteen million packages for shipment daily.").  The charges leading to FedEx's 2018 settlement agreement with BIS are a case in point.  Had FedEx not been subject to the EAR, it might have been free to ship controlled items to the listed entities Aerotechnic and PINSTECH.  *See* Exh. A.  But because FedEx is subject to the EAR, it is required

---

[8] *See also Trane Co. v. Baldrige*, 552 F. Supp. 1378, 1389 (W.D. Wis. 1983) (rejecting substantive due process challenge to anti-boycott provision of Export Administration Act and implementing regulations); *Nat'l Ass'n of Recycling Indus., Inc. v. Sec'y of Commerce*, 494 F. Supp. 158, 161 n.5 (D.D.C. 1980) ("[A]s economic/regulatory legislation, the [Export Administration] Act in general and section 7(c) in particular appear sufficiently reasonable in both their means and their objectives to withstand scrutiny in terms of substantive due process requirements.").

[9] The EAR define a forwarding agent as "[t]he person in the United States who is authorized by a principal party in interest to perform the services required to facilitate the export of the items from the United States.  This may include air couriers or carriers. "  15 C.F.R. § 772.1

to reject such shipments in the absence of a license, thus helping to prevent controlled items from reaching those entities.

It makes no difference that FedEx alleges it must adjust its business operations to comply with the EAR.  Regulations are not arbitrary simply because they "readjust the burdens of the private sector in furtherance of a public purpose."  *Nachman Corp. v. Pension Ben. Guar. Corp.*, 592 F.2d 947, 958 (7th Cir. 1979), *aff'd*, 446 U.S. 359 (1980).  Indeed, courts must uphold challenged regulations even if they are "to some extent both underinclusive and overinclusive."  *Vance v. Bradley*, 440 U.S. 93, 108, 99 S. Ct. 939, 948, 59 L. Ed. 2d 171 (1979).  As long as the regulations advance a legitimate government interest, as the EAR clearly do here, it is immaterial if they might "work[] to the disadvantage of a particular group."  *Romer v. Evans*, 517 U.S. 620, 632 (1996).

Stripped away of the pretense of irrationality, FedEx's substantive due process claim reduces to a policy complaint.  FedEx would prefer that it be exempt from the EAR, in the same way that, according to FedEx, "internet service providers and telecommunications companies" are shielded from certain liabilities.  Compl. ¶ 59 (citing 21 U.S.C. § 822(c), 47 U.S.C. § 230(c)(1)).  But a policy preference does not create a constitutional violation.  The "Fifth Amendment gives the federal courts no power to impose upon [coordinate branches] their views of what constitutes wise economic or social policy."  *Bowen v. Gilliard*, 483 U.S. 587, 596–97 (1987).  This is especially true concerning matters of national security and foreign affairs.  Federal judges do not "begin the day with briefings that may describe new and serious threats to our Nation and its people," *Boumediene v. Bush,* 553 U.S. 723, 797 (2008), and it is vital in this context that courts not "substitute [their] own evaluation of evidence for a reasonable evaluation" by the Executive, *Rostker v. Goldberg,* 453 U.S. 57, 68, 101 S. Ct. 2646, 69 L.Ed.2d 478 (1981).  A decision to

exempt companies like FedEx from the EAR would require considering potential risks to national security and foreign policy interests and determining whether those interests sufficiently could be furthered in the absence of such regulations.  Simply put, such weighing of interests is a task for the Executive Branch, not Article III courts.  *See Karn*, 925 F. Supp. at 13 ("The Court will not substitute its policy judgments for that of the President, especially in the area of national security." (citations omitted)); *Regan v. Wald*, 468 U.S. 222, 242–243 (1984) (declining invitation to conduct an "independent foreign policy analysis").

In sum, the EAR are rationally related to the Government's legitimate interest in preventing exports, re-exports, and in-country transfers that could prove detrimental to national security and foreign policy interests, and it is not arbitrary to apply those regulations to forwarding agents like FedEx.  FedEx's preference to be exempt from the EAR is immaterial under the Fifth Amendment.  Accordingly, FedEx has failed to state a claim for violation of its substantive due process rights, and its claim should be dismissed.

## II.      FedEx's ECRA Claim Should Be Dismissed.

In Count II of its complaint, FedEx alleges that the EAR are inconsistent with an introductory section of ECRA, titled "Statement of Policy."  50 U.S.C. § 4811.  *See* Compl. ¶¶ 74–86.  This section lays out a number of policy goals for ECRA, and provides that the authority under ECRA's relevant subchapter "may be exercised only in furtherance of all of the objectives set forth" in the section.  50 U.S.C. § 4811(11).

FedEx focus on two of the section's many policy statements.  First, it points to statement one, which provides that it is the policy of the United States

> [t]o use export controls only after full consideration of the impact on the economy of the United States and only to the extent necessary—

16

> **(A)** to restrict the export of items which would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States; and
>
> **(B)** to restrict the export of items if necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations.

*Id.* § 4811(1); *see* Compl. ¶ 80.  According to FedEx, to apply the EAR to entities like itself is not "necessary" to "protect the national security of the United States or further significantly its foreign policy."  *Id.* ¶ 83.

FedEx next points to statement eight, which provides that

> [t]he export control system must ensure that it is transparent, predictable, and timely, has the flexibility to be adapted to address new threats in the future, and allows seamless access to and sharing of export control information among all relevant United States national security and foreign policy agencies.

50 U.S.C. § 4811(8); *see* Compl. ¶ 81.  Based on this statement, FedEx appears to suggest that the EAR are insufficiently "predictable" to comply with the statute.  Compl. ¶ 81 ("The ECRA also requires that the export control system must ensure that it is predictable" (citation omitted)).

FedEx does not identify any of the other policy goals set forth in § 4811, although there are many.  These include, for example,

- that items be controlled to prevent their use in the proliferation of weapons of mass destruction and conventional weapons, acts of terrorism, foreign military programs that could pose a threat to the United States or its allies, and activities that could disrupt critical infrastructure, 50 U.S.C. § 4811(2)(A);

- that items be controlled to preserve the qualitative military superiority of the United States, to strengthen the defense industrial base, to carry out U.S. foreign policy including the protection of human rights and promotion of democracy, to carry out international commitments, to facilitate military interoperability with allies, and to focus national security controls on core technologies and other items that pose a serious threat to the nation, *id.* § 4811(2)(B)–(G);

- that the United States maintains it leadership in science, technology, engineering and manufacturing, *id.* § 4811(3);

- that the United States participate in multilateral organizations and agreements regarding export controls, rather than implementing regulations unilaterally, and that it cooperate with other nations in regard to export controls, *id.* § 4811(4)–(6);

- that the United States have a clear understanding of which items are controlled and that there be an efficient process for regular updates to those controls, *id.* § 4811(7);

- that implementing and enforcing export controls requires robust capabilities in monitoring, intelligence, and investigation, appropriate penalties for violations, and the ability to swiftly interdict unapproved transfers, *id.* § 4811(9);

- that the President and cabinet secretaries have a regular and robust process to identify emerging and other types of critical technologies of concern and to regulate their release to foreign persons, *id.* § 4811(10).

As set forth below, FedEx's ECRA claim should be dismissed for several different reasons, including that it raises a non-justiciable political question, that ECRA expressly precludes jurisdiction over the claim, and that FedEx has failed to state a proper claim for relief.

### a. FedEx's ECRA Claim Raises A Non-Justiciable Political Question.

At the outset, FedEx's claim that the EAR is inconsistent with the "Statement of Policy" section of ECRA raises a non-justiciable political question. "The political question doctrine is essentially a function of the separation of powers and excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." *El–Shifa Pharm. Indus. Co. v. United States,* 607 F.3d 836, 840 (D.C. Cir. 2010) (en banc) (citations omitted); *see also Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005) ("[T]he courts lack jurisdiction over political decisions that are by their nature committed to the political branches to the exclusion of the judiciary . . . ." (citation omitted)).

Under the Supreme Court's decision in *Baker v. Carr*, 369 U.S. 186 (1962), the political question doctrine bars a court from considering a claim when

18

> [p]rominent on the surface of [the] case . . . is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217.  To find that the Court lacks subject matter jurisdiction because the claim under review is a political question, "the Court need only conclude that one factor is present, not all." *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 313 (D.C. Cir. 2014) (citation omitted).

FedEx's ECRA claim raises a classic political question.  To adjudicate this claim, the Court would have to determine whether applying the EAR to forwarding agents like FedEx is "necessary" to restrict the export of items which would make a "significant contribution" to the military potential of a foreign country (or countries) and "prove detrimental" to national security, and whether application of the regulations is "necessary" to "further significantly" U.S. foreign policy or "fulfill" international obligations.  50 U.S.C. § 4811(1).  In other words, the Court would be forced to weigh evidence about the national security and foreign policy benefits of regulating forwarding agents under the EAR, and the risks of not doing so, and to determine ultimately whether doing so is "necessary" to serve those interests.  These are quintessential political judgments—"decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility." *People's Mojahedin Org. of Iran v. U.S. Dep't of State*, 182 F.3d 17, 23 (D.C. Cir. 1999) (citation omitted) (holding that question whether organization "threatens the security of United States nationals or the national security of the United States" was non-justiciable political question).

The Ninth Circuit's decision in *United States v. Mandel,* 914 F.2d 1215 (9th Cir. 1990), illustrates why this case raises a political question. There, the Ninth Circuit considered whether the Secretary's decision to add an item to the Commodity Control List (the predecessor to the Commerce Control List) was an unreviewable political question. *Id.* at 1222. At the time, the former Export Administration Act contained a policy section much like ECRA's, which set forth various policy goals that export control decisions, including listing actions, were required to carry out. *See* 50 U.S.C. § 2402 (repealed); *see also id.* § 2403(d) (repealed). One of the goals in that policy section was nearly identical to the national security objective set forth in ECRA's § 4811(1)(A), on which FedEx now principally relies.[10]  After examining that goal and others in the Export Administration Act, the Ninth Circuit explained that

> [t]he [Export Administration Act] requires the Secretary to consider such things as whether the imposition of export controls would be detrimental to the foreign policy or national security interests of the United States, whether restrictions on a given commodity would fulfill declared international obligations of this country, and whether the export of a given commodity would make a significant contribution to the military potential of other countries.  These are quintessentially matters of policy entrusted by the Constitution to the Congress and the President, for which there are no meaningful standards of judicial review

*Mandel*, 914 F.2d at 1223 (citations omitted).  The Ninth Circuit thus held that the Secretary's listing decision was a non-justiciable political question.  *Id.*

---

[10] *Compare* 50 U.S.C. § 4811(1)(A) (ECRA provision) ("The following is the policy of the United States . . . To use export controls only after full consideration of the impact on the economy of the United States and only to the extent necessary . . . to restrict the export of items which would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States."), *with* 50 U.S.C. § 2402(2)(A) (repealed Export Administration Act provision) ("It is the policy of the United States to use export controls only after full consideration of the impact on the economy of the United States and only to the extent necessary . . . to restrict the export of goods and technology which would make a significant contribution to the military potential of any other country or combination of countries which would prove detrimental to the national security of the United States.")

Here, FedEx asks the Court to consider whether Defendants complied with a policy objective nearly identical to the one at issue in *Mandel*.  As a result, just as in *Mandel*, the issue is entrusted to coordinate branches.  *See also United States v. Moller-Butcher*, 560 F. Supp. 550, 554 (D. Mass. 1983) ("Whether particular items make a significant contribution to a country's military potential and hurt our own national security is the quintessential political question.  It entails a policy judgment best left to the executive branch, and is incapable of resolution by any judicially discoverable or manageable standard."); *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990) (holding that "[t]he question whether a particular item should have been placed on the [Arms Export Control Act's] Munitions List" was non-justiciable because it "possesses nearly every trait that the Supreme Court has enumerated traditionally renders a question 'political'"); *United States v. Helmy*, 712 F. Supp. 1423, 1429 (E.D. Cal. 1989).

Indeed, FedEx's claim implicates at least four of the *Baker v. Carr* factors.  For starters, there is a "textually demonstrable constitutional commitment of the issue to a coordinate political department."  *Baker*, 369 U.S. at 217; *see Schneider*, 412 F.3d at 195 ("It cannot [] be denied that decision-making in the areas of foreign policy and national security is textually committed to the political branches.").  There is also "a lack of judicially discoverable and manageable standards."  *Baker*, 369 U.S. at 217.  To adjudicate FedEx's claim, the Court would have to decide what "prove[s] detrimental" to U.S. national security, what "further[s] significantly the foreign policy of the United States," and whether certain export controls are "necessary" given those considerations.  50 U.S.C. § 4811(1).  Neither statutory interpretation nor case law can provide a rubric for resolving these questions, which turn on value judgments and strategic priorities well outside the bounds of Article III.  *See El-Shifa*, 607 F.3d at 843 (finding no "manageable standards" to evaluate "the strategic choices directing the nation's foreign affairs").  Nor is there any guide

for how the Court should determine whether the EAR is "predictable" (if that goal indeed is encompassed by FedEx's claim), or what the Court should do if the goals identified by FedEx conflict with any of the various other objectives enumerated in § 4811.

Further, to make the value judgments just described, the Court inevitably would be making "an initial policy determination of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217; *see, e.g.*, *Karn*, 925 F. Supp. at 12 (declining to apply test that "would require the Court to scrutinize the actual injury to national security"). Nor would it be possible for the Court to "undertak[e] independent resolution" of FedEx's claim "without expressing lack of the respect due coordinate branches of government." *Baker*, 369 U.S. at 217.   Accordingly, the political question doctrine bars consideration of FedEx's statutory claim.  *See Schneider*, 412 F.3d at 198 (finding no jurisdiction where "at least the first four of the six *Baker* factors compel a determination that th[e] case raises political questions committed to the political branches.").

In short, FedEx asks the Court to ignore fundamental percepts of the separation of powers by weighing and making value judgments on matters of national security and foreign policy.  Its claim under ECRA thus raises a non-justiciable political question, and should be dismissed.

### b.   ECRA Precludes Jurisdiction Over FedEx's Claim.

Even if FedEx's statutory claim did not raise a political question, the claim still would be unreviewable because Congress has expressly withdrawn this Court's jurisdiction.  "Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 133 S. Ct. 1059, 1064 (2013) (citation omitted).  Congress may thus withhold from any court of its creation jurisdiction of any controversy.  *Sheldon v. Sill*, 49 U.S. 441, 449 (1850).  Although courts presume that Congress ordinarily "intends judicial review of administrative action," that presumption is "rebuttable by a clear statement of congressional intent

to preclude review." *Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1128 (D.C. Cir. 2017) (citation omitted). Congress therefore is free to leave district courts without jurisdiction to review statutory claims against an agency. *See Ralpho v. Bell*, 569 F.2d 607, 622 & n.101 (D.C. Cir. 1977) (observing that nothing "prevent[s] [Congress] from shielding even the most patent deviation from the statutory scheme from judicial redress where the Constitution is in no wise implicated"). When review of administrative action has been withheld by Congress, courts lack subject-matter jurisdiction to hear claims challenging the agency's conduct. *See Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1071 (D.C. Cir. 2018).

Here, although the APA "confers a general cause of action upon persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute,' 5 U.S.C. § 702," *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984), and accordingly waives the Government's sovereign immunity against such claims, *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999), ECRA expressly withdraws that jurisdictional grant and waiver of immunity as to "functions exercised under" the principle subchapter of the act, 50 U.S.C. § 4821(a); *see Dart v. United States*, 848 F.2d 217, 221 (D.C. Cir. 1988) (interpreting nearly identical provision in Export Administration Act as barring judicial review of "functions exercised under" that act).

FedEx's ECRA claim falls squarely within the statute's preclusion-of-review provision. FedEx challenges the EAR, which are regulations imposed by the President and Secretary of Commerce and maintained under the authorities provided in ECRA's principle subchapter. *See* 50 U.S.C. §§ 4801–4826. The issuance, maintenance, update, and enforcement of those regulations all are "functions exercised under" the authorities in ECRA. *See, e.g.*, *id.* § 4813(a) (granting Secretary of Commerce authority to "establish and maintain" lists of controlled items, persons and end uses; to require licenses and compliance measures; and to inspect, search, detain,

or seize items and impose temporary denial orders).  Indeed, FedEx's complaint is premised on the notion that unless it follows the EAR, it will be subject to enforcement actions and potential civil and criminal penalties, all of which are "functions exercised under" the relevant subchapter. *See id.* §§ 4819–20 (granting enforcement authority to the Secretary of Commerce and establishing civil and criminal penalties for violations of rules issued under the act).

FedEx's arguments in support of its statutory claim confirm that it challenges "functions exercised under" ECRA.  As explained above, FedEx complains that, in determining that the EAR should apply to entities like it, Defendants essentially over-weighed certain national security and foreign policy considerations.  But evaluating such interests to determine what exemptions should be included in the EAR clearly is a "function" that Defendants "exercised under" ECRA.  *See Dart*, 848 F.2d at 225 ("It bears repeating that the [nearly identical clause in the Export Administration Act] covers *all* 'functions exercised under the Act.'").

Ultimately, FedEx does not point to any cause of action or waiver of sovereign immunity other than the APA's § 702, and, in fact, all but concedes that ECRA withdraws the APA's conferral of jurisdiction, *see* Compl. ¶ 76 (referring to "when a statute exempts agency action from administrative review under the Administrative Procedures Act").  Section 4821(a) is a clear statement of Congressional intent to preclude review of "functions exercised under" the relevant subchapter of ECRA, and FedEx's statutory claim challenges precisely those functions. Accordingly, the Court lacks subject matter jurisdiction over Count II.

### i.  The Narrow *Ultra Vires* Exception Does Not Apply.

FedEx seeks to evade Congress's express preclusion of review by casting its ECRA claim as one challenging "*ultra vires*" agency action.  Compl. ¶ 77.  But *ultra vires* review is an

24

exceedingly narrow exception to the general principle of sovereign immunity and is not available here.

Originally described in *Leedom v. Kyne*, 358 U.S. 184 (1958), the exception for *ultra vires* review applies only where "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts in excess of its delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory." *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (quoting *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009)). To satisfy this test, an agency's actions must "be so extreme that one may view it as jurisdictional or nearly so." *Nyunt,* 589 F.3d at 449 (citation omitted). *Ultra vires* review is "a doctrine of last resort," *Schroer v. Billington*, 525 F. Supp. 2d 58, 65 (D.D.C. 2007), and "is intended to be of extremely limited scope," *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006) (citation omitted). As a result, "a *Leedom v. Kyne* claim is essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds." *Nyunt,* 589 F.3d at 449. For multiple reasons, FedEx's *ultra vires* claim fails to meet this exceptionally high bar.

### 1.    ECRA Expressly Precludes Judicial Review.

In the first place, *ultra vires* review is unavailable because § 4821(a)'s preclusion of FedEx's claim is "express", rather than "implied." *Nyunt*, 589 F.3d at 449. The text of the provision is clear: "functions exercised under" the relevant subchapter of ECRA will not be subject to the APA's grant of jurisdiction over agency actions. *See* 50 U.S.C. § 4821(a). In enacting § 4821(a), Congress spoke "clearly and directly," leaving nothing for the Court to imply. *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 44 (1991). And as explained above, FedEx's challenge falls squarely within the terms of the statute's clear language. Consider,

by contrast, *Kyne* itself, where "the NLRB contended that a statutory provision that provided for judicial review *implied, by its silence*, a preclusion of review of the contested determination." *Id.* (emphasis added) (discussing *Kyne*). Because the preclusion of review in *Kyne* was implied, *ultra vires* review was appropriate. But the opposite conclusion is warranted here, where § 4821(a), by its plain text, precludes FedEx's challenge to the EAR.

This reading of § 4821(a) comports with the D.C. Circuit's decision in *Dart*, which dealt with two provisions in the now-repealed Export Administration Act. 848 F.2d 217. The first provision at issue was nearly identical to § 4821(a), as it too withdrew the APA's grant of jurisdiction with respect to "functions exercised under" the now-repealed Export Administration Act. *Id.* at 221 (quoting 50 U.S.C. § 2412(a) (repealed)). The second provision provided that, on appeal from an export enforcement proceeding, the "Secretary shall, in a written order, affirm, modify, or vacate the decision of the administrative law judge," and that "[t]he order of the Secretary shall be final and is not subject to judicial review." *Dart*, 848 F.2d 221 (quoting 50 U.S.C. § 2412(c) (repealed)). "[T]aken together," the D.C. Circuit explained, "these clauses bar judicial review only of 'functions exercised under the Act' and of 'orders' of the Secretary that 'affirm, modify, or vacate' the ALJ's initial decision." *Dart*, 848 F.2d 221. The allegations in *Dart* involved an export enforcement action where, after the ALJ found in favor of the defendant, the Secretary *reversed* the ALJ's decision and imposed penalties on the defendant. *Id.* at 220. The D.C. Circuit concluded that while the Secretary was permitted to "affirm, modify, or vacate" the ALJ decision, he lacked the authority to "reverse" that decision. *Id.* at 221. Thus, the Secretary's order reversing the ALJ was neither a "function[] exercised under the Act" nor an "order[]" of the Secretary exempt from judicial review. *Id.* Accordingly, the D.C. Circuit held that *ultra vires*

review was available because the agency action being challenged was not "expressly" precluded by either of the two provisions in the Export Administration Act. *Id.* at 222.

Here, by contrast, although faced with one nearly identical statue, judicial review expressly *is* precluded because what FedEx challenges indisputably *is* a "function exercised under" ECRA's principle subchapter. The fact that in *Dart* a nearly identical preclusion provision did not expressly bar review of the claim at issue does not mean review similarly is available here, where a wholly different claim is under consideration. *See Amgen, Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004) ("If a no-review provision shields particular types of administrative action, a court . . . must determine whether the challenged agency action *is of the sort* shielded from review." (emphasis added)). Indeed, since *Dart*, the D.C. Circuit has stated that "*Dart* stands for the exceedingly narrow proposition that a statute precluding review is limited by its language." *McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of Judicial Conference of U.S.*, 264 F.3d 52, 63 (D.C. Cir. 2001). Looking to the language of § 4821(a), it expressly precludes review of FedEx's claim. For that reason, *ultra vires* review is unavailable. *See, e.g.*, *MCorp Fin.*, 502 U.S. at 44 (holding that *ultra vires* review was precluded where statute provided "clear and convincing evidence that Congress intended to deny the District Court jurisdiction").

## 2. FedEx Has Not Alleged A Patent Violation Of ECRA.

Even if FedEx could surmount the requirement that statutory preclusion of review be implied, rather than express, FedEx's request for *ultra vires* review faces a more fundamental obstacle: FedEx has not alleged a clear violation of ECRA.

For an agency to have acted "in excess of its delegated powers" and thus "*ultra vires*," it must do more than simply act in an unreasonable or arbitrary-and-capricious manner. It must "patently misconstrue[] a statute, disregard[] a specific and unambiguous statutory directive, or

violate[] a specific command of a statute." *Organogenesis, Inc. v. Sebelius*, 41 F. Supp. 3d 14, 23 (D.D.C. 2014) (citation omitted); *see Fla. Health Sci. Ctr. v. Sec'y of Health & Human Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016) ("To challenge agency action on the ground that it is *ultra vires*, [the plaintiff] must show a patent violation of agency authority. . . . A violation is 'patent' if it is 'obvious' or 'apparent.'").   In this case, FedEx's allegation that the EAR is inconsistent with ECRA's Statement of Policy section does not come close to the sort of obvious violation necessary for *ultra vires* review to be available.

To start with, FedEx's theory runs headlong into the text of the statute.  Section 4826(a) of ECRA, titled "Transition provisions," specifically states that all "rules", "regulations", and "other forms of administrative action" that have been "made", "issued", "or allowed to become effective" under the Export Administration Act (as continued under IEEPA), or under the EAR, "*shall continue in effect according to their terms until modified, superseded, set aside or revoked*" under the authority set forth in ECRA.  50 U.S.C. § 4826(a) (emphasis added).  In other words, ECRA specifically states that the EAR have not been withdrawn or rendered invalid.  This transition provision provides an unambiguous statutory rebuttal to FedEx's argument that ECRA somehow impliedly repealed certain "rules" and "regulations" "issued" under the EAR.  *Id.*

The legislative history confirms what the text states clearly.  For example, the House conference report to the 2019 NDAA explained that ECRA "would provide transition provisions to *preserve the export control rules and regulations until changed or revoked* under the new authority established by this title."   H.R. Conf. Rep. No. 5515, 115th Cong., 2d Sess. 1079 (2018) (emphasis added).   That same report similarly stated that "[t]he repeal of the [Export Administration Act] would include transition provisions to ensure that all rules, regulations, orders, determinations, licenses, or other administrative measures established under the [Export

Administration Act], or otherwise enforced through Presidential emergency declaration under IEEPA, *would remain in effect unless changed or revoked* under the new authority established by this title." *Id.* at 1080 (emphasis added)). This legislative history demonstrates that Congress intended to preserve the EAR, not to silently repeal them to the extent they apply to forwarding agents.

The structure of the act points in the same direction. Much of ECRA is dedicated to laying out the various authorities of the President, Secretary of Commerce and other cabinet secretaries with respect to export controls. *See, e.g.*, *id.* §§ 4812–4813, 4820. ECRA thus provides a statutory basis for the EAR, which at the time of ECRA's enactment had been continued in force through executive orders under IEEPA. It would make no sense for ECRA to establish an express statutory basis for the EAR in one part, but to implicitly repeal some of those same regulations in another. *See United States v. Atl. Research Corp.*, 551 U.S. 128, 135 (2007) ("Statutes must be read as a whole.").

Setting aside the transition provisions and history and structure of the act, FedEx simply has not alleged a "patent" violation of the "Statement of Policy" section. *Organogenesis*, 41 F. Supp. 3d at 23. FedEx can point to no "unambiguous statutory directive" or "specific command" that Defendants have flouted. *Id.* Despite FedEx's wishes, ECRA, like the EAR, does not contain a specific exemption for forwarding agents. And although FedEx points to alleged exemptions for "internet service providers and telecommunications companies" in other statutes, that simply demonstrates that Congress knows how to create exemptions when it wants to, and has not done so here. *See* Compl. ¶ 59 (citing 21 U.S.C. § 822(c), 47 U.S.C. § 230(c)(1)).

Instead, FedEx points to the word "necessary" in § 4811(1), and "predictable" in § 4811(8). But as explained earlier, the question of what is "necessary" for national security and foreign policy

purposes requires a careful assessment and weighing of national security and foreign policy interests. *Id.* § 4811(1). Yet even given the most charitable reading, the complaint is silent on those issues. The complaint includes no allegations about the (supposed lack of) national security and foreign policy benefits to be gained by applying the EAR to forwarding agents. Nor does the complaint contain any allegations about why the EAR are not "predictable." To the contrary, the gist of the complaint appears to be that FedEx predictably will be subject to enforcement actions if it does not receive the injunctive relief it desires. And to the extent FedEx complains it cannot "predict" the contents of its packages, that means its *customers* are unpredictable, not the EAR. *Id.* § 4811(8).

More generally, the terms "necessary" and "predictable" are not the sort of language that could ever be capable of a clear and patent violation. The lines drawn by these terms are imprecise, and the question of what is "necessary" or "predictable" is open to debate. *See Dart*, 848 F.2d 217, 231 (D.C. Cir. 1988) ("[A]n agency action allegedly 'in excess of authority' must not simply involve a dispute over statutory interpretation."). As a result, *ultra vires* review is unavailable for allegations that such terms have been violated. *See, e.g.*, *DCH*, 925 F.3d at 509 (rejecting *ultra vires* review of allegation that agency did not use "appropriate data"); *Nyunt*, 589 F.3d at 449 (same for allegation that agency failed to hire "suitably qualified" U.S. citizens).

In contrast, consider, for example, the allegation at issue in *Dart*—that the Secretary *reversed* an ALJ decision he was permitted only to "affirm, modify, or vacate." *Dart*, 848 F.2d 221 (quoting 50 U.S.C. § 2412(c) (repealed)). Or consider the allegation in *Kyne*, where, although a statute provided that the National Labor Relations Board shall not certify a bargaining unit including professionals and other employees "unless a majority of such professional employees vote for inclusion in such unit," the plaintiff alleged that the Board had certified just such a

bargaining unit after *not* taking a vote among professional employees.  *Kyne*, 358 U.S. at 185 (quoting 29 U.S.C. § 159(b)(1)).  In both cases, the alleged violation was plain from the face of the statue—worlds apart from what FedEx alleges here.

In sum, FedEx's reading of ECRA as impliedly repealing the EAR would turn ECRA on its head.  That statute was enacted to create a statutory authority for the EAR, not to repeal them.  Furthermore, the complaint lacks any allegation of why the regulations at issue are not "necessary" or "predictable."  Indeed, the generalized language on which FedEx relies is not of the sort that could ever be violated in a clear and patent manner.  This demonstrates that FedEx has not alleged a clear statutory violation sufficient to invoke *ultra vires* review.

### c.   FedEx Fails To State A Claim For Violation Of ECRA.

Finally, even if FedEx could get around the above threshold considerations, the Court still should dismiss Count II because FedEx has not alleged a plausible violation of ECRA.  *Iqbal*, 556 U.S. at 678.  As mentioned, nowhere does the complaint address why regulating entities like FedEx is not "necessary" for national security or foreign policy reasons.  50 U.S.C. § 4811(1).  Nor does the complaint allege how the EAR is not "predictable."  Thus, even if these standards were judicially enforceable, FedEx's allegations are conclusory.  *Iqbal*, 556 U.S. at 678.  Especially in light of the significant deference afforded to the Executive Branch in this area, *see, e.g.*, *Humanitarian Law Project*, 561 U.S. at 33–34, FedEx's statutory claim should be dismissed.

### CONCLUSION

Accordingly, for the reasons set forth in this memorandum, the complaint should be dismissed.


Dated: September 10, 2019                              Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

DIANE KELLEHER
Assistant Branch Director

*/s/ Matthew Skurnik*
MATTHEW SKURNIK (NY 5553896)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 616-8188
Email: Matthew.Skurnik@usdoj.gov

*Counsel for Defendants*