## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDEX CORPORATION,          ) | |
|        ) | |
|        Plaintiff,     ) | |
|        ) | |
|        ) | |
| v.        ) | |
|        ) | |
|        ) | Case No. 1:19-cv-01840 - JDB |
| U.S. DEPARTMENT OF COMMERCE;  ) | |
| WILBUR ROSS, in his official capacity as  ) | |
| Secretary of Commerce,     ) | |
|        ) | |
| BUREAU OF INDUSTRY AND SECURITY;  ) | |
|        ) | |
| and        ) | |
|        ) | |
| NAZAK NIKAKHTAR, in her official  ) | |
| capacity as Assistant Secretary for Industry  ) | |
| and Analysis,      ) | |
|        ) | |
|      Defendants. | |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................... 3

ARGUMENT ......................................................................................................... 10

    I. FedEx's *Ultra Vires* Claims Are Properly Before the Court ......................... 10

        A.    ECRA Does Not Prohibit *Ultra Vires* Review ......................... 11

        B.    FedEx Has Asserted Justiciable Claims Because It Does Not Raise a Political Question ...................................................................... 14

        C.    The Political Question Doctrine is a Narrow Exception that Applies Only to Discretionary Policy Issues ............................. 14

            i.    FedEx Raises Specific Questions of Statutory Authority ............ 15

            ii.    None of the *Baker* Factors Justifies Imposing the Political Question Doctrine ........................................................ 17

            iii.    The Statutory Issues Are Extricable from Any Policy Questions ................................................................................ 21

        D.    FedEx Has Alleged A Patent Violation Because the EAR Violate the Statute on Its Face ....................................................... 22

    II.    FedEx Has Stated a Cause of Action Under ECRA ........................... 22

    III.    FedEx Has Stated a Substantive Due Process Claim ........................... 23

        A.    The Regulations are Not Rationally Related to a Legitimate Government Purpose ............................................................... 24

        B.    The Regulations are Vastly Over-Inclusive .............................. 29

CONCLUSION ...................................................................................................... 31

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abu Ali v. Ashcroft*,
   350 F. Supp. 2d 28 (D.D.C. 2004) ...............................................................................15, 20

*Adams v. United States*,
   796 F. Supp. 2d 67 (D.D.C. 2011) ......................................................................................24

*Al-Tamimi v. Adelson*,
   916 F.3d 1 (D.C. Cir. 2019) ...............................................................................16, 21, 22

*Am. Employers Ins. Co. v. Am. Sec. Bank., N.A.*,
   747 F.2d 1493 (D.C. Cir. 1984) .........................................................................................19

*Amgen Inc. v. Smith*,
   357 F.3d 103 (D.C. Cir. 2004) ...........................................................................................13

*AT&T Corp. v. Iowa Utils. Bd.*,
   525 U.S. 366 (1999) ...........................................................................................................19

*Bailey v. United States*,
   516 U.S. 137 (1995) .............................................................................................................4

*Baker v. Carr*,
   369 U.S. 186 (1962) ...............................................................................................15, 17, 21

*Bd. of Governors of the Fed. Res. Sys. v. MCorp Fin.*,
   502 U.S. 32 (1991) .............................................................................................................13

*Beaty v. Republic of Iraq*,
   480 F. Supp. 2d 60 (D.D.C. 2007) ......................................................................................15

*Bowen v. Michigan Academy of Family Physicians*,
   476 U.S. 667 (1986) ...........................................................................................................11

*Brown v. Barry*,
   710 F. Supp. 352 (D.D.C. 1989) ........................................................................................26

*Cellular Telecomms. & Internet Ass'n v. FCC*,
   330 F.3d 502 (D.C. Cir. 2003) ...........................................................................................19

*Cleveland Bd. of Educ. v. LaFleur,*
    414 U.S. 632 (1974)..................................................................................25, 29

*Colby v. Riggs Nat'l Bank,*
    92 F.2d 183 (D.C. Cir. 1937)..................................................................19

*Cornwell v. Hamilton,*
    80 F. Supp. 2d 1101 (S.D. Cal. 1999)....................................................29

*Council of Prison Locals v. Brewer,*
    735 F.2d 1497 (D.C. Cir. 1984)..............................................................22

*D.C. Fin. Responsibility Mgmt. Auth. v. Concerned Senior Citizens of the
    Roosevelt Tenant Assoc.,*
    129 F. Supp. 2d 13 (D.D.C. 2000)..........................................................11

*Dart v. United States,*
    848 F.2d 217 (D.C. Cir. 1988)..........................................................12, 13

*Davis v. Bandemer,*
    478 U.S. 109 (1986)................................................................................21

*Devincci Salah Hourani v. Mirtchev,*
    796 F.3d 1 (D.C. Cir. 2015)............................................................17, 20

*El-Shifa Pharm. Indus. Co. v. United States,*
    607 F.3d 836 (D.C. Cir. 2010)................................................................20

*Estate of French,*
    365 A.2d 621 (D.C. 1976) .................................................................29, 30

*Gault v. Garrison,*
    569 F.2d 993 (7th Cir. 1977) .................................................................28

*George Wash. Univ. v. District of Columbia,*
    391 F. Supp. 2d 109 (D.D.C. 2005)........................................................24

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013)................................................................28

*Gouled v. United States,*
    255 U.S. 298 (1921)................................................................................24

*Harris v. Koenig,*
    722 F. Supp. 2d 44 (D.D.C. 2010)..........................................................19

*Japan Whaling Ass'n v. Ame. Cetacean Soc'y,*
    478 U.S. 221 (1986)..........................................................................17, 18

*Jones v. Air Line Pilots Ass'n, Int'l,*
   713 F. Supp. 2d 29 (D.D.C. 1976) ......................................................................24

*Kansas v. Ryce,*
   368 P.3d 342 (Kan. 2016) .................................................................................24

*Kaplan v. Cent. Bank of the Islamic Republic of Iran,*
   896 F. 3d 501 (D.C. Cir. 2018) .........................................................................14

*Karn v. U.S. Dep't of State,*
   925 F. Supp. 1 (D.D.C. 1996) ......................................................................28, 29

*Knapp Med. Ctr. v. Hargan,*
   875 F.3d 1125 (D.C. Cir. 2017) ........................................................................13

*Marbury v. Madison,*
   5 U.S. 137 (1803) .............................................................................................12

*March for Life v. Burwell,*
   128 F. Supp. 3d 116 (D.D.C. 2015) ...............................................................26, 29

*Merrifield v. Lockyer,*
   547 F.3d 978 (9th Cir. 2008) ............................................................................25

*Mitchell v. Forsyth,*
   472 U.S. 511 (1985) .........................................................................................28

*Nat. Resources Defense Council, Inc. v. Thomas,*
   838 F.2d 1236 (D.C. Cir. 1988) ........................................................................19

*Pearson v. Callahan,*
   555 U.S. 223 (2009) .........................................................................................28

*Robinson v. Florida,*
   804 So.2d 451 (Fla. Dist. Ct. App. 4th 2001) ....................................................29

*Romer v. Evans,*
   517 U.S. 620 (1996) .....................................................................................24, 25

*Schneider v. Kissinger,*
   412 F.3d 190 (D.C. Cir. 2005) ..........................................................................20

*Sprietsma v. Mercury Marine,*
   537 U.S. 51 (2003) .............................................................................................4

*St. Joseph Abbey v. Castille,*
   712 F.3d 215 (5th Cir. 2013) ........................................................................25, 28

*Starr Int'l Co. v. United States*,
 910 F.3d 527 (D.C. Cir. 2018) ................................................................................15, 16, 18

*U.S. Dep't of Agric. v. Moreno*,
 413 U.S. 528 (1973) ..............................................................................................................25

*U.S. Dep't of Commerce v. Montana*,
 503 U.S. 442 (1992) ..............................................................................................................21

*United States v. Mandel*,
 914 F.2d 1215 (9th Cir. 1990) ............................................................................................20

*United States v. Martinez*,
 904 F.2d 601 (11th Cir. 1990) ............................................................................................20

*United States v. Moller-Butcher*,
 560 F. Supp. 550 (D. Mass 1983) ......................................................................................20

*United States v. Munoz-Flores*,
 495 U.S. 385 (1990)................................................................................................................19

*Zivotofsky v. Clinton*,
 566 U.S. 189 (2012)........................................................................................................14, 18

**STATUTES**

Export Control Reform Act of 2018, 50 U.S.C. § 4819 ....................................................... *passim*

**REGULATIONS**

15 C.F.R. § 730.6 ...................................................................................................................25

15 C.F.R. § 732 ........................................................................................................................8

15 C.F.R. § 734.3 ...................................................................................................8, 25, 26, 27

15 C.F.R. §736.2 .......................................................................................................................4

15 C.F.R. §744.16 ............................................................................................................7, 25, 26

15 C.F.R. §764.2 ................................................................................................................4, 5, 27

15 C.F.R. § 772 .....................................................................................................................7, 8

15 C.F.R. § 772.1 .....................................................................................................................26

## PRELIMINARY STATEMENT

Plaintiff, FedEx Corporation ("FedEx"), by and through its undersigned counsel, hereby files its memorandum in opposition to Defendants, the U.S. Department of Commerce ("Commerce"); Wilbur Ross, in his official capacity as Secretary of Commerce ("Ross"); the Bureau of Industry and Security ("BIS"); and Nazak Nikakhtar, in her official capacity as Assistant Secretary for Industry and Analysis, performing the non-exclusive duties of the Under Secretary for Industry and Security ("Nikakhtar" and, together with Commerce, Ross, and BIS, "Defendants") motion to dismiss FedEx's complaint for declaratory, injunctive, and other relief.

## INTRODUCTION

FedEx is an international common carrier that delivers millions of packages every day.  As a common carrier, FedEx cannot know the contents of every package it transports.  For that reason, Congress expressly limited the export violation liability of common carriers such as FedEx—*i.e.*, those companies that transfer, transport, or forward packages as a service provided to other parties. Congress held common carriers liable only where they have "knowledge" of the violation.  *See* Export Control Reform Act of 2018 ("ECRA"), 50 U.S.C. § 4819(a)(2)(E).  Notwithstanding this restriction, Commerce, through the Export Administration Regulations (the "EAR"), holds FedEx and other common carriers strictly liable for "causing" other parties' violations of the EAR.

As applied to FedEx, the EAR lack statutory authorization and invade FedEx's Fifth Amendment rights.  FedEx seeks to enjoin the enforcement of the EAR against it and to declare those sections of the EAR unlawful as applied to FedEx.  Specifically, FedEx asserts that Commerce is engaging in an *ultra vires* violation because it holds common carriers strictly liable where the statute clearly requires that common carriers be liable only for knowing violations (Count II).  In addition, FedEx asserts that the regulatory regime imposed by the EAR is such a

substantial burden that it deprives FedEx of substantive due process under the Fifth Amendment (Count I).

Commerce moved to dismiss both counts.  Commerce argues that Count II should be dismissed because 1) it raises a non-justiciable political question; 2) judicial review is expressly precluded under the applicable statute; and 3) FedEx failed to state a claim for relief because FedEx did not allege a patent violation.  Commerce is mistaken.  First, this matter does not involve a political question; rather, it is a very straightforward review of the manner in which a United States government agency is seeking to regulate the activities of a United States corporation.  That is not a political question; it is precisely the type of issue that the federal courts can and do address every day.  The judiciary is exclusively responsible to reign in an "administrative state" that has strayed beyond its Congressional mandate, as is the case here.  Second, ECRA does not preclude judicial review.  Indeed, this argument is belied by the text of the statute and controlling case law, which confirms that FedEx's *ultra vires* claim is justiciable.  Third, FedEx did allege a patent violation—Commerce's violation of Section 4819 is apparent on the face of the regulation and clearly supports an *ultra vires* claim.  For these reasons, Commerce's Motion to Dismiss Count II should be denied.

Next, Commerce argues that the Court should dismiss FedEx's substantive due process claim for failure to state a claim.  This argument likewise fails.  Commerce contends that application of the EAR to FedEx is rationally related to national security because it incentivizes FedEx's customers to comply with the EAR. Contrary to Commerce's position, holding FedEx strictly liable for other parties' violations of the EAR does not "reduce the extent to which sensitive and dangerous items reach potential bad actors."  First, pursuant to the EAR, the exporter (in this case, FedEx's customer) is only held liable if it "knowingly" engages in a prohibited export, whereas the common carrier is held to a strict liability standard under a separate "Violations"

section of the EAR.  Thus, FedEx may be held liable for customer violations in situations where the customer itself would not be found liable.  This outcome belies Commerce's contention that a system whereby FedEx must monitor the packages would promote shipper compliance with the EAR.  Second, FedEx cannot police customer shipments for violations of the EAR because it does not have knowledge of the contents of the shipment.  Notably, a shipment does not violate the EAR unless it includes an "item subject to the EAR."  Even if FedEx were to inspect customer shipments—an impractical and unconstitutional means in itself—FedEx would still not be in a position to police customer shipments because it is not possible to identify an EAR violation from a plain view inspection of the shipment.  Whether the package contains an "item" is a highly technical determination that is beyond FedEx's prowess.  Thus, as a common carrier, FedEx is left with one of three unfair and impractical options: 1) open and inspect shipments to try and divine EAR compliance; 2) return shipments that may in fact be compliant and legally exported; or 3) deliver the package and take the risk of a BIS enforcement action of the kind to which FedEx has been subjected in the past.  This result is over-inclusive and fails to withstand constitutional scrutiny.  Holding FedEx strictly liable for other parties' violations of the EAR fails to further the legitimate interest of national security and foreign policy interests.  The Court should deny Commerce's Motion to Dismiss.

## FACTUAL BACKGROUND

FedEx provides worldwide transportation, e-commerce, and business solutions to its customers.  Compl. ¶ 2, ECF No. 1.  Best recognized for its time-sensitive, air-ground express service, FedEx receives, transports, and delivers approximately fifteen million packages daily.  *Id.* ¶¶ 2–3.  As a common carrier, FedEx is subject to ECRA and its implementing regulations, the EAR.  *See id.* ¶ 4.

ECRA sets forth ten "specific unlawful acts," which Commerce may regulate.  *See* 50 U.S.C. § 4819.  Two of these unlawful acts are central to FedEx's claim here.  In subsection (B), Congress allowed Commerce to punish parties who "cause or aid, abet . . . the doing of any act prohibited . . . [by the EAR.]"  *See id.* § 4819(a)(2)(B).  However, in subsection (E), Congress chose to prohibit only "transfer[ing], transport[ing] . . . forward[ing] . . . any item exported or to be exported from the United States, or that is otherwise subject to the [EAR], *with knowledge* that a violation of this subchapter, the [EAR] . . . has occurred, is about to occur, or is intended to occur[.]" *Id.* § 4819(a)(2)(E) (emphasis added).  By choosing to address "transferring, transporting, and forwarding" in a separate provision of the list from "causing," Congress clearly carved out "transferring, transporting, and forwarding" from the "causing" regime.  Indeed, any reading of "causing" that included "transferring, transporting, and forwarding" would render subsection (E) wholly superfluous.  *See Sprietsma v. Mercury Marine*, 537 U.S. 51, 63 (2003) (interpreting word "law" to also include "regulations" could render word "regulation" superfluous); *Bailey v. United States*, 516 U.S. 137, 146 (1995) ("We assume that Congress used two terms because it intended each term to have a particular, nonsuperfluous meaning.").  ECRA, therefore, commands that "transferring, transporting, or forwarding," which covers the core services provided by FedEx as a common carrier, only be punished if FedEx has knowledge that a violation of the EAR has occurred or will occur.  *See* § 4819(a)(2)(E).

The EAR has a different structure, which Commerce has abused to circumvent ECRA's carve-out.  Like in ECRA, §736.2(b) of the EAR enumerates several distinct "General Prohibitions," including "transferring, transporting, and forwarding with knowledge."  However, unlike in ECRA, the EAR fails to protect this carve-out against "causing, aiding, abetting" liability.  On the contrary, the EAR places "causing, aiding, abetting" in the separate, overarching

"Violations" section.  *See* §764.2(b).  The EAR then purports to apply "causing" liability to any violation, including the carved-out actions of transferring, transporting, and forwarding, thereby removing the *scienter* requirements.[1]

In other words, a common carrier can be held strictly liable under §764.2(b) for causing its customer's prohibited export when, in fact, it is the customer who exported the item and violated one of the General Prohibitions.  For example, under General Prohibition 5, an exporter is prohibited from knowingly exporting any item subject to the EAR to a prohibited end-user, such as a party on the Entity List.  While the exporter is held liable only if it "knowingly" engages in a prohibited export under, for example, General Prohibition 5, the common carrier is held to a strict liability standard under the separate "Violations" section of the EAR.  This outcome patently contravenes the plain language of ECRA.

As a result, the EAR grants Commerce license to charge a common carrier for the *same conduct* as a direct prohibited act with knowledge, or as a causing violation that requires no knowledge.  Pursuant to the EAR, then, a common carrier may be held liable for unwittingly causing a violation of the General Prohibitions, even without knowledge that a "violation of this subchapter, the [EAR] . . . has occurred, is about to occur, or is intended to occur." § 4819(a)(2)(E); *see* Defs.' Mot. Dismiss, at 24; ECF No. 18.

After FedEx filed this lawsuit, Secretary Wilbur Ross commented: "What the regulations say is that neither FedEx nor any other common carrier can knowingly carry goods that are in

---

[1] Section 4819(a)(2)(A) of ECRA, which provides that no person may engage in "conduct prohibited" by the EAR, does not overcome the clear conflict between ECRA and the EAR as applied to common carriers.  The "conduct prohibited" referenced in that ECRA provision is, in fact, the General Prohibitions.  This is clear based on the language used in Section 764.2(a), which provides that it is not allowed to engage in prohibited conduct, which mirrors the language used in Section 736.2(b) setting out the General Prohibitions.  In other words, Section 4819(a)(2)(A) of ECRA does not incorporate the separate "causing, aiding, and abetting" language in Section 764.2(b) of the EAR.

violation of the rules.  Knowingly.  That means they have to know they are in violation.  We are not asking [FedEx] or anyone else to be a policeman.  We are just asking them not to conspire with people to avoid [the regulations]."   *Fox Business*, (June 26, 2019 at minute 3:25), https://video.foxbusiness.com/v/6052459162001/#sp=show-clips.

If the regulatory scheme under the EAR followed the common sense approach suggested by the Secretary, this litigation would not have been necessary: Knowledge is what ECRA requires, but Commerce does not enforce the regulations in this manner.  Instead, Commerce holds common carriers liable for causing a violation of the General Prohibitions, even without knowledge.  For example, in 2018, FedEx settled an administrative proceeding in which BIS alleged that FedEx committed 53 violations of the EAR.  Specifically, BIS alleged that FedEx "caused, aided or abetted acts prohibited by the [EAR]" when it transported "items subject to the [EAR] . . . valued in total at approximately \$58,091, from the United States to . . . France, or Pakistan, without the required BIS license."  *See* Ex. A to ECF No. 18; *see also* Compl. ¶ 53. Notably, there was no allegation that FedEx had *knowledge* that the shipment contained "items" that were "subject to the EAR," or whether FedEx had sufficient information regarding the content of shipment to identify a prohibited export.  Rather, BIS applied the much lower "causing, aiding or abetting standard," which has no such knowledge requirement.

 Similarly, in a 2011 settlement, BIS held FedEx liable for shipments to restricted parties without a license.  Neither the charging document nor the settlement agreement indicated that FedEx had any knowledge that the shipments in question (which occurred in 2004–2006) were in fact violations of export control laws.

In enforcement actions against other common carriers, the publicly available documents do not mention "knowledge" at all, indicating a strict liability standard as applied to common

carriers.  For example, in a 2008 enforcement action against DHL, BIS stated only that "DHL forwarded an export of 11 tiltometers, items subject to the Regulations and designated as EAR99, to a UAE entity, Mayrow General Trading," which was a violation of the EAR because "a license is required to export or reexport any item subject to the Regulations to Mayrow General Trading and no export license had been obtained."  The Order does not state whether or not DHL knew or had reason to know that the shipment was subject to the EAR, or knew or had reason to know that an export license had not been obtained.  *See* Order, in the Matter of: DHL Holdings (USA), Inc. (March 14, 2008).

Commerce's application of the EAR in this manner is further complicated by the EAR's framework. The EAR regulate the 1) export, reexport (shipments or transmissions of items from one non-U.S. country to another non-U.S. country), and transfer (in-country) of 2) "items subject to the EAR." Violations only occur where a third factor is present, *i.e.*, an item subject to the EAR is exported, reexported, or transferred to a party that requires a license under the EAR, such as an entity listed on the Entity List (§744.16), and no such license has been obtained.  In short, a violation of the EAR occurs only where all three conditions are satisfied.  Because FedEx is merely a common carrier and is not the exporter,[2] FedEx does not have knowledge of the contents of the shipment and cannot determine whether these conditions exist; namely, whether a package includes "an item"; if so, whether that item is "subject to the EAR;" and if so, if export licensing requirements would apply, whether export licenses are in fact in place.

---

[2] FedEx is not itself an "exporter" as defined under the EAR. The EAR define "exporter" as the "person in the United States who has the authority of a principal party in interest to determine and control the sending of items out of the United States."  15 C.F.R. § 772.  Typically, the "principal party in interest" would be the seller or other party who determines whether to export the items. While that may describe FedEx's customers, it does not describe FedEx.  FedEx is a common carrier that transports shipments as a service provided to its customers.

Not everything is an "item."  As defined in the EAR, an "item" is only a "commodity,"[3] "software,"[4] or "technology,"[5] each of which are themselves defined terms under the EAR.  For example, commercial or financial documents that do not include "technology" would not be considered "items."  As such, it is conceivable that the contents of many packages destined to entities on the Entity List would not contain "items" in the first instance and therefore would not violate the EAR.  *See* 15 C.F.R. § 772.

Further, not all "items" are "subject to the EAR."  Rather, the meaning of "subject to the EAR" is set out in a number of provisions in Section 732.  It includes items exported from the United States, if exported (*i.e.*, reexported) from abroad, non-U.S. produced items that incorporate greater than *de minimis* levels of controlled U.S. content by value (with exceptions for certain highly controlled content where any amount is sufficient), and foreign-made direct products of highly controlled U.S.-origin technology or software.  *See* Compl. ¶ 27 (citing 15 C.F.R. § 732).  Further, there are numerous provisions that exclude various "items" from the definition of "items subject to the EAR," including, but not limited to, items that are subject to the jurisdiction of certain other government agencies, published information and software, fundamental research, and certain information in patents or patent applications.  *See* 15 C.F.R. § 734.3(b).

---

[3] "Commodity" is defined as: "Any article, material, or supply except technology and software."

[4] "Software" is defined in the EAR as: "A collection of one or more 'programs' or 'microprograms' fixed in any tangible medium of expression."  "Programs" and "microprograms" are themselves defined terms.

[5] "Technology" is defined as: "Information necessary for the 'development,' 'production,' 'use,' operation, installation, maintenance, repair, overhaul, or refurbishing (or other terms specified in ECCNs on the CCL that control 'technology') of an item."  "Development", "production" and "use" are themselves separately defined, and the definition of "technology" also includes several notes that further clarify the definition, as well as other provisions related to the definition of "technology" that incorporate additional requirements and further definitions.

In other words, the analysis necessary to determine whether the contents of a particular shipment include an "item" that is "subject to the EAR" is highly technical and requires access to detailed information, such as the nature of the contents as well as the value of U.S. controlled content contained within a given item and/or specific information about the technology or software used to create the item. Compl. ¶ 28. Given the daily volume of export shipments, its time and day-definite services, and lack of technical expertise, common carriers cannot make such assessments.

To identify whether the sender and/or recipient are on the Entity List, FedEx screens the names and addresses of its shippers and the designated recipients prior to delivering any package. Compl. ¶ 5. In fact, at great expense, FedEx developed and employs a sophisticated proprietary risk-based compliance system to perform such screening and takes its responsibility to comply with the law seriously. *Id.* The task of determining whether a package contains "an item subject to the EAR," however, is simply impossible for a common carrier such as FedEx. Even if FedEx were required to inspect the contents of every package, the company would not have sufficient information to make highly technical determinations to assess whether an item is an "item subject to the EAR." Compl. ¶ 40. Because FedEx cannot make this determination, it has no other option than to return shipments that may in fact be compliant and legally exported. Transporting the shipments carries the risk of a BIS enforcement action of the kind to which it has been subjected in the past. *Id.* ¶¶ 43–44.

Shipping packages to entities on the Entity List (even without knowledge of an EAR violation) exposes FedEx to unfair and unlawful liability. The EAR offer no safe-harbor provision for common carriers such as FedEx. To the contrary, as set forth above, common carriers are held strictly liable as causers, aiders, and abettors of EAR violations committed by their customers,

with steep penalties.  Compl. ¶ 7.  A single violation of ECRA subjects FedEx to criminal penalties of up to $1,000,000 and civil penalties of $300,000 (or twice the value of the transaction per individual violation).  *See* ECRA § 1760(b) (criminal penalties); 50 U.S.C. § 4819(b),(c) (civil penalties).

## ARGUMENT

### I.  FedEx's *Ultra Vires* Claims Are Properly Before the Court

FedEx asserts that Commerce engaged in an *ultra vires* violation.  Commerce's imposition of strict liability against common carriers such as FedEx violates ECRA's clear command that carriers be liable only for "knowing" violations.  For this reason, the regulations, as applied to FedEx, fail.  Fundamental separation of powers principles dictate that executive agencies may not wield legislative powers.  Commerce fails to engage with FedEx's *ultra vires* argument in any substantive way, and instead, attempts to avoid judicial review altogether.  First, it claims that Section 4821's limited finality provision should be expanded in this case to preclude not only Administrative Procedure Act ("APA") review, but also *ultra vires* review.[6]  This argument is directly contrary to the text of the statute, controlling case law, and Commerce's own cases, all of which confirm that Section 4821 does not apply to *ultra vires* claims.  Second, it argues that FedEx's challenge to Commerce's improper regulations are excluded under the narrow political question doctrine.  This argument is premised on a fundamental misreading of FedEx's complaint.  FedEx alleges that Commerce violated Congress's clear command, because Commerce may not punish unknowing transferring, transporting, or forwarding.  The federal judiciary routinely addresses such statutory concerns.  Third, Commerce contends that FedEx's *ultra vires* review is

---

[6] At various points, Commerce argues that an imagined APA claim fails.  Because FedEx has not asserted an APA violation, these arguments are not responsive to any relevant legal issue and will not be addressed here.

not allowed because FedEx has not alleged a patent violation.   But, Commerce's violation of Section 4819(E) is apparent on the face of the regulation and clearly supports an *ultra vires* claim. For the reasons set forth below, all three arguments fail.

### A.  ECRA Does Not Prohibit *Ultra Vires* Review

Commerce asserts that Section 4821's limited exclusion of APA review somehow also bars *all forms* of judicial review, including *ultra vires* review.   In arguing for total exclusion, Commerce bears a "heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of [it]s decision." *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 671 (1986).   "Only upon a showing of clear and convincing evidence of a contrary legislative intent [may the] court restrict access to judicial review." *Id*.   Commerce does not come close to carrying this heavy burden, as the text of the statute, controlling case law, and Commerce's own cases confirm that Section 4821 is a limited exclusion of administrative challenges that has nothing to do with *ultra vires* claims.

To begin with, Section 4821's limited application to APA claims is clear on its face. Section 4821 applies only to "[a]dministrative procedure" and states only that "the functions exercised under this subchapter shall not be subject to sections 551, 553 through 559, and 701 through 706 title 5," *i.e.*, the APA.   50 U.S.C.§ 4821(a).   The statute never mentions *ultra vires* review or any other form of judicial review.   Not only is there nothing in the statute to suggest that it applies to any other form of review, but, in fact, Congress expressly enumerated the forms of review that were excluded and *deliberately chose* to leave *ultra vires* review off.   *See, e.g.*, *D.C. Fin. Responsibility Mgmt. Auth. v. Concerned Senior Citizens of the Roosevelt Tenant Assoc.*, 129 F. Supp. 2d 13, 16 (D.D.C. 2000) (applying *expressio unius est exclusio alterios*, the Circuit held that the D.C. Housing Act did not apply to the D.C. Financial Responsibility and Management Authority ("Control Board"), because "the affirmative statement that certain laws 'shall apply' to

the Control Board necessarily implies that laws not referenced shall *not* apply."); *Marbury v. Madison*, 5 U.S. 137, 174 (1803) ("affirmative words are often, in their operation, negative of other objects than those affirmed.").

The D.C. Circuit has already held that this "identical" exclusion of APA review has no bearing on *ultra vires* challenges. *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988); *see also* Defs.' Mot. Dismiss, at 23. In *Dart*, the D.C. Circuit considered whether Section 13(a) of the EAA, which stated that, "functions exercised under this Act are excluded from the operation of" certain sections of the [APA,]" precluded an *ultra vires* challenge. *Dart*, 848 F.2d at 221. In rejecting arguments identical to what Commerce now raises, *Dart* held that "instead of directly barring review of all export control decisions, the *statute only makes the APA's guarantee of judicial review inapplicable to EAA 'functions.'" Id.* at 224 (emphasis added). In other words, "[t]his [provision] serves only to take away what the APA has otherwise given—namely, the APA's own guarantee of judicial review. It does not repeal the review of *ultra vires* actions that was recognized long before." *Id*. Because FedEx is asserting an *ultra vires* challenge, *see* Compl. ¶¶ 74–89, and Section 4821 clearly allows such challenges by deliberately leaving out a prohibition on *ultra vires* review, FedEx has stated a claim that this Court may adjudicate.

Commerce's arguments do not change this result. On the contrary, they confirm that *ultra vires* review is available. First, Commerce asserts that Section 4821 is distinguishable from the Section 13(a) in *Dart* on the grounds that statutory exclusion provisions are limited by their language. Defs.' Mot. Dismiss, at 27. But the language in Section 13(a) in *Dart*—"functions exercised under this Act are excluded from the operation of" certain sections of the APA—is functionally *identical* to the language in Section 4821—"functions exercised under this subchapter shall not be subject to" the same sections of the APA. Second, Commerce argues that Section

4821 "expressly" bars all forms of judicial review.  This, too, misstates the text.  Section 4821 cannot "expressly" bar all forms of judicial review because it does not even mention other forms of review.  Like Section 13(a) in *Dart*, Section 4821 refers to only one form of review—APA review, thus barring only that form of review.

Tellingly, Commerce does not cite a single case holding that a statute excluding solely APA review is, in fact, an express prohibition of all forms of review.  And, all of the "no-review" provisions it cites serve only to prove them wrong; all of those statutes include *additional* language *missing* from Section 4821.  For instance, the provision in *Amgen* barred both administrative review *and* judicial review.  *Amgen Inc. v. Smith*, 357 F.3d 103, 111 (D.C. Cir. 2004) ("[t]here shall be no administrative *or judicial review* under section 1395ff, 1395oo, of this title, or otherwise[.]").  Further, *Bd. of Governors of the Fed. Res. Sys. v. MCorp Fin.*, is also distinguishable as it bars *all courts* from having jurisdiction.  *See* 502 U.S. 32, 39 (1991) ("*no court* shall have jurisdiction[.]").  *Knapp* is to the same effect.  *See Knapp Med. Ctr. v. Hargan*, 875 F.3d 1125, 1127 (D.C. Cir. 2017) ("there shall be no administrative or judicial review").  Because there is nothing in Section 4821 to suggest that Congress intended to wholly insulate the agency from any judicial supervision, *ultra vires* review is available.[7]

---

[7] Even if the language expressly precluded judicial review, which it does not, judicial review would still be appropriate here because this case involves a "discrete" legal issue that need only be resolved once.  *Dart v. United States*, 848 F.2d 217, 222 (1988) (courts have recognized that even if a finality provision broadly precludes review, courts can nevertheless consider the issue "while still preserving the finality that Congress sought in the vast majority of cases").  As detailed in Section I.B the issue is a discrete and purely legal one that will not be affected by any particular facts: Did Congress empower Commerce to hold common carriers liable on something less than knowledge?

B.  FedEx Has Asserted Justiciable Claims Because It Does Not Raise a Political
    Question

Commerce also argues that the *ultra vires* challenge presents non-justiciable questions

because it challenges only Commerce's discretionary policy decisions.  This is a fundamental

mischaracterization of FedEx's arguments.  At bottom, FedEx's claims are purely statutory and

rely on the clear dictates of ECRA.  Specifically, FedEx alleges that ECRA, on its face, prevents

Commerce from holding common carriers liable on something less than knowledge.  The question

of whether the text of ECRA limits Commerce's authority to impose strict liability against

common carriers is clearly committed to this Court's jurisdiction.  So, too, are the related questions

of whether such a strict liability regime would violate ERCA's prohibition on unpredictable

controls and wholly unnecessary regulations.  Such statutory analysis, even when it touches upon

national security or international relations, "is what courts do."  *See Kaplan v. Cent. Bank of the*

*Islamic Republic of Iran*, 896 F. 3d 501, 514 (D.C. Cir. 2018) (refusing to apply political question

doctrine and interpreting "whether the circumstances involve an act of war within the meaning of

the statutory exception.").  Executive agencies must be held to the Congressional mandate that

authorized their powers in the first instance.  Further still, Commerce completely skips the essential

step of determining whether the core legal issues are extricable from any political questions.

Because the question of Commerce's statutory authority can be decided on the face of the statute,

it is clearly extricable and must be decided by this Court.

C.  The Political Question Doctrine is a Narrow Exception that Applies Only to
    Discretionary Policy Issues

A court has the responsibility to decide cases properly before it, even those it "would gladly

avoid."  *Zivotofsky v. Clinton*, 566 U.S. 189, 194–95 (2012) (quotations omitted).  A court cannot

"avoid [its] responsibility" to enforce a specific statutory right "merely 'because the issues have

political implications,'" *id.* at 196, and "it is error to suppose that every case or controversy which

touches foreign relations lies beyond judicial cognizance[,]" *see Baker v. Carr*, 369 U.S. 186, 211 (1962). Notably, "the Supreme Court has made it clear that application of the political question doctrine is a limited and narrow exception to federal court jurisdiction." *Starr Int'l Co. v. United States*, 910 F.3d 527, 533 (D.C. Cir. 2018); *Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 64 (D.D.C. 2004) ("the pervasive influence of political question doctrine in fields touching on foreign affairs has not led courts to surrender their power to protect individuals against government action. To the contrary, individual rights are protected carefully, although within a framework that takes account of the broad substantive powers of other branches.").

To determine whether an issue falls within the narrow confines of the political question doctrine, a court must conduct "discriminating inquiry into the precise facts and posture" of each case to ensure the case truly involves "policy choices and value determinations." *See Baker*, 369 U.S. at 217; *Beaty v. Republic of Iraq*, 480 F. Supp. 2d 60, 71–72 (D.D.C. 2007). There are three steps. First, the court must identify the specific questions and issues raised by the plaintiffs' complaint. *See Baker*, 369 U.S. at 211. Next, the court must use the six *Baker* factors to determine whether any specific issue presents a political question. Finally, if a political question is implicated, the court must decide whether plaintiffs' claims can be resolved without considering that issue.

i. FedEx Raises Specific Questions of Statutory Authority

Consistent with the Supreme Court's teachings that the political question doctrine is one of "political *questions*" and "not one of political cases," *Baker*, 369 U.S. at 217 (internal quotations omitted), courts in this Circuit have repeatedly emphasized that the focus of the political question doctrine must be on the "specific claims" at issue, *see, e.g.*, *Beaty*, 480 F. Supp. at 71–72 ("Iraq cannot secure dismissal on political-question grounds simply by invoking the foreign-affairs label; a closer examination of both the 'specific claims' brought by plaintiffs and the issues alleged to constitute 'political questions' is required."). Specifically, "in foreign policy cases,

courts must first ascertain if '[t]he federal courts are . . . being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination' or, instead, merely tasked with, for instance, the 'familiar judicial exercise' of determining how a statute should be interpreted or whether it is constitutional." *Starr Int'l Co.*, 910 F.3d at 534.  To that end, courts must ignore rhetoric and creative framing, and focus on the particular question posed in the specific case.  *See Al-Tamimi v. Adelson*, 916 F.3d 1, 8–9 (D.C. Cir. 2019).  "Abstraction and generality do not suffice."  *Id.*

Yet, Commerce's entire brief is premised on an improper framing of FedEx's claims. Commerce argues that FedEx's *ultra vires* claim challenges the wisdom of Commerce's national security and foreign policy judgments.  This is simply wrong.  The central question presented by FedEx's Complaint is whether ECRA gives Commerce authority to punish transferring, transporting, or forwarding without knowledge.  This is a purely statutory question.  It concerns the proper meaning of Section 4819.  To answer this question, the Court does not need to consider any discretionary decisions; it simply needs to review the statute.

To be sure, Commerce's decision to violate Congress's clear dictates also runs afoul of other prohibitions within the statute that come closer to policy considerations.  However, even these arguments do not actually challenge the wisdom of Commerce's decisions or seek a judicial determination regarding a bona fide political question; they seek only to enforce Congress's statutory prohibitions.  For instance, a regulation that imposes different requirements than allowed by Congress would *ipso facto* create an unpredictable regime, in which common carriers would not know what standard will ultimately be applied to them and, as a result, what steps they are required to take.  In addition, Congress has already deemed that punishing carriers under a strict

liability theory is not "necessary" because it expressly stated that they may be punished only for a "knowing" violation.  *See* 50 U.S.C. § 4819(a)(2)(E).

  ii. <u>None of the *Baker* Factors Justifies Imposing the Political Question Doctrine</u>

  With this issue properly framed as a statutory question, Commerce cannot that demonstrate any of the *Baker* factors apply.  As an initial matter, Commerce's half-hearted argument that there is a textually demonstrable commitment of this issue to the agency merely because this case involves national security or foreign policy, Defs.' Mot. Dismiss, at 31, is clearly erroneous.  *See Baker*, 369 U.S. at 211 (it is "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance").  Consistent with these requirements, courts considered numerous statutory claims even though they touch upon foreign affairs and national security.  *Devincci Salah Hourani v. Mirtchev*, 796 F.3d 1, 8 (D.C. Cir. 2015) ("[T]o be sure, a judgment in the case might implicate the actions of a foreign government and the Act of State doctrine. But that has never been enough, by itself, to trigger the political question doctrine's jurisdictional bar.").

  *Japan Whaling Ass'n v. Am. Cetacean Soc'y* is instructive.  *See* 478 U.S. 221, 229–30 (1986).  There, petitioners challenged Commerce's decision to refuse to certify that Japan's whaling practices "diminish the effectiveness" of a governing treaty.  Commerce claimed that the political question doctrine applied because the suit implicated the Secretary's foreign policy decision-making and sought to cause the Secretary to "dishonor and repudiate an international agreement."  *Id*. at 229.  The Court rejected this framing, explaining that:

> it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts.  It is also evident that the challenge to the Secretary's decision not to certify Japan for harvesting whales in excess of IWC quotas presents a purely legal question of statutory interpretation.  The Court must first determine the nature and scope of the duty imposed upon the Secretary by the Amendments, a decision which calls for applying no more than the traditional rules of statutory construction, and then applying this

> analysis to the particular set of facts presented below.  We are cognizant of the interplay between these Amendments and the conduct of this Nation's foreign relations, and we recognize the premier role which both Congress and the Executive play in this field. But under the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones.

*Id.  Zivotofsky* also confirms that courts must resolve disputes over statutory rights, even if they touch upon areas affecting foreign policy or national security.  566 U.S. at 201.  In *Zivotofsky*, a U.S. citizen born in Jerusalem claimed the State Department violated Section 214 of the Foreign Relations Authorization Act by refusing to list "Israel" on his passport.  566 U.S. at 191–92.  State Department officials claimed that the political question doctrine barred review because their refusal was based on their policy judgment that such a distinction would raise foreign policy concerns.  *Id.* at 192–93.  Reversing the lower court, the Supreme Court held that the claim was justiciable because the Court was not being asked to determine whether Jerusalem is the capital of Israel; it was tasked only with deciding whether there was a statutory right to have Israel designated as his place of birth.  *Id.* at 195.

Here, too, the *case* generally touches upon matters of foreign relations and national security, but the *legal issues* do not turn on them.  To the contrary, the fundamental question for the court is a statutory one, which requires only that the Court interpret the statute and apply the statute's requirements to the regulation at hand.  *See, e.g.*, *Zivotofsky*, 566 U.S. at 193, 196 (while case generally implicated sovereignty of Israel, the particular question before the Court required only the "familiar judicial exercise" of whether "interpretation of the statute [was] correct"); *Starr Int'l Co.*, 910 F.3d at 533–36 (reversing district court's dismissal on political question grounds; "Starr's claim requires a court to 'determine the nature and scope of the duty imposed' on the U.S. Competent Authority under Article 22(6), 'a decision which calls for applying no more than the

traditional rules of statutory construction' with respect to the U.S.-Swiss Treaty, 'and then applying this analysis to the particular set of facts' of Starr's case.'").

Commerce's argument that there are no judicially discoverable and manageable standards fails for the same reason.  This Court is well-equipped to analyze statutory structure and determine the issue actually before it, *i.e.*, whether Congress required common carriers to have "knowledge" and what "knowledge" means.[8]  *See, e.g.*, *Am. Employers Ins. Co. v. Am. Sec. Bank., N.A.*, 747 F.2d 1493, 1498 (D.C. Cir. 1984) (analyzing what constitutes "knowledge" under the Uniform Commercial Code); *Harris v. Koenig*, 722 F. Supp. 2d 44, 55–56 (D.D.C. 2010) (interpreting the meaning of "actual knowledge" within section 413(2) of the Employee Retirement Income Security Act of 1974); *Colby v. Riggs Nat'l Bank*, 92 F.2d 183, 194 (D.C. Cir. 1937) (interpreting the meaning of "actual knowledge" within D.C. Code § 31 et. seq. (1929)).  So, too, is it able to determine the subsidiary questions of whether the regulation violates the requirement of a "predictable" and "necessary" regime. *See, e.g.*, *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 388–89 (1999) (interpreting the "necessary" standard under the Telecommunications Act of 1996); *Cellular Telecomms. & Internet Ass'n v. FCC*, 330 F.3d 502, 509–10 (D.C. Cir. 2003) (same); *Nat. Resources Defense Council, Inc. v. Thomas*, 838 F.2d 1236–37 (D.C. Cir. 1988) (interpreting the meaning of "necessary" under the Clean Air Act); *United States v. Munoz-Flores*, 495 U.S. 385, 396 (1990) ("Surely a judicial system capable of determining when punishment is "cruel and unusual," when bail is "[e]xcessive," when searches are "unreasonable," and when congressional action is "necessary and proper" for executing an enumerated power is capable of making the more prosaic judgments demanded by adjudication of Origination Clause challenges."); *see also Devinci*

---

[8] Again, Commerce ignores the "knowing" requirements of ECRA.  Clearly, the Court does not have to decide what "prove[s] detrimental" to national security or what "further[s] significantly foreign policy" to determine whether ECRA requires knowledge.

*Salah Hourani v. Mirtchev*, 796 F.3d 1, 8 (D.C. Cir. 2015) (declining to find a case nonjusticiable under the political question doctrine where "the standards needed to resolve" the claims at issue were "the workaday tools for decision-making that courts routinely employ," even though the court's judgment "might implicate the actions of a foreign government").[9]

The cases cited by Commerce are readily distinguishable. Each of these cases alleged a failure to properly discharge certain discretionary functions. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836 (D.C. Cir. 2010) (challenging decision to language military strike); *Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005) (resolving claims would require judiciary to pass judgment on whether specific military actions were wrongful); *United States v. Martinez*, 904 F.2d 601, 602 (11th Cir. 1990) (whether "particular item should have been placed on" the Arms Export Contract Act's Munition List); *United States v. Moller-Butcher*, 560 F. Supp. 550, 554 (D. Mass 1983) (same). For instance, the plaintiff in *United States v. Mandel* questioned the manner in which the Secretary exercised his discretionary authority of deciding whether a certain individual or item should be placed on the prohibited list. 914 F.2d 1215, 1223 (9th Cir. 1990). In *Mandel*, there was no dispute that Congress empowered the agency to make this individualized interpretation. Here, however, FedEx is arguing that Congress deliberately withheld from Commerce the discretion to decide the required mind state, and prohibited Commerce from punishing a carrier that acts without knowledge. *See Abu Ali v. Ashcroft*, 350 F.

---

[9] Commerce's additional arguments are as conclusory as they are unavailing. The Court need not make a policy determination to find that Congress required "knowledge," as such a requirement comes from the plain text. Nor does the Court have to scrutinize injuries to national security to determine whether "common carriers" will be unable to predict the enforcement regime governing them. The inconsistency between the statute and the regulation are more than enough to make this finding. The Court need not make an "independent" examination of the decision because Congress has already spoken on the matter.

Supp. 2d 28, 64 (D.D.C. 2004) (differentiating between cases challenging failure to properly perform duty and those involving actions in violation of duties).[10]

### iii.  The Statutory Issues Are Extricable from Any Policy Questions

Assuming *arguendo* that the above questions do implicate political issues, which they do not, the Court must examine whether these issues are "inextricable from the case."[11]  *Baker*, 369 U.S. at 217; *see also U.S. Dep't of Commerce v. Montana*, 503 U.S. 442, 456 (1992); *Davis v. Bandemer*, 478 U.S. 109, 122 (1986).  This is a required step that Commerce misses.

The Circuit's recent ruling in *Al-Tamimi*, dictates that, if this Court finds a "jurisdiction-stripping political question[s]," it must still conduct a careful inquiry to determine whether that inquiry is necessary to resolving the claim at hand.  916 F.3d at 10–11.  In *Al-Tamimi*, plaintiffs sued pro-Israeli individuals and entities, claiming that defendants were involved in a conspiracy to wrongfully remove Palestinians from the disputed territory and engaging in genocide, and other war crimes.  *Id.* at 4.  The lower court dismissed all counts on political question grounds, finding that plaintiffs' claims involved sensitive questions regarding who has sovereignty over the disputed territories.  *Id.* at 5.  The Circuit reversed and remanded.  It held that while the determination regarding sovereignty would raise a political question, this issue was extricable from the case.  *Id.* at 13–14.  As the Court explained, the legal determination that Israeli settlers did or did not commit genocide in the disputed territory would not decide the ownership of the disputed territory and thus would not directly contradict any foreign policy choice.  *Id.* at 13.

---

[10] In addition, the Court can easily determine whether the enforcement regime is unpredictable as applied to common carriers without considering policy-focused questions regarding the desirability of the regulation.

[11] Because FedEx has not raised a political question, the Court need not consider whether severability is possible.

Here, too, any discretionary decisions regarding national security policy and foreign affairs are extricable from the purely statutory question before the Court. The Court need not determine whether holding common carriers liable under strict liability is prudent or even a sound policy choice in order to interpret and enforce the clear dictates of Congress.

D.   FedEx Has Alleged Patent Violation Because the EAR Violate the Statute on Its Face

Commerce also seeks to avoid review by claiming that FedEx has failed to allege a patent violation; however, this argument misconstrues FedEx's Complaint. As discussed *supra*, ECRA has a "clear and mandatory" requirement that Commerce not hold common carriers liable if they engage in an unknowing violation. *Cf. Council of Prison Locals v. Brewer*, 735 F.2d 1497, 1501 (D.C. Cir. 1984). The EAR circumvent that clear limitation through the "causing" provision and/or application of its overly broad definition of knowledge.

Commerce argues that FedEx's theory requires the Court to determine whether Congress "impliedly repealed" the EAR. *See* Defs.' Mot. Dismiss, at 28. According to Commerce, the legislative history shows that Congress intended for the EAR to remain in effect until set aside. *Id.* at 29. But this ignores the fact that ECRA sets out a *different* regime than that in the EAR. Instead of the EAR's two-tiered system of direct acts and "causing" direct acts, ECRA lists all offenses under one list, clearly indicating that each are separate, distinct ways the statute may be violated. Because the EAR violates a clear command from Congress, FedEx has stated a cognizable *ultra vires* claim.

## II.  FedEx Has Stated a Cause of Action Under ECRA

Commerce's thread-bare argument that FedEx fails to state a claim under ECRA merits little consideration, as it is premised on the same misreading discussed above. Commerce asserts that FedEx cannot state a claim because the Complaint does not demonstrate how the regulation is unnecessary for national security and creates an unpredictable statutory regime. However, such

allegations are not necessary to resolve the actual issue before the Court—whether the EAR violate ECRA's statutory mandate.[12]  Because Defendants' Rule 12(b)(6) arguments does not address this issue, the motion to dismiss should be denied.

### III. FedEx Has Stated a Substantive Due Process Claim

The strict liability regime set forth in the EAR has broad implications, which violate FedEx's Fifth Amendment substantive due process rights.  Holding FedEx strictly liable for customer violations requires FedEx to determine whether shipments do in fact violate the EAR. As a common carrier, FedEx is left with one of three unfair and impractical options: open and inspect shipments to try and divine EAR compliance; return shipments that may in fact be compliant and legally exported; or deliver the package and take the risk of a BIS enforcement action of the kind to which FedEx has been subjected in the past.  Aside from these options, there is no other way that FedEx, as a common carrier, can ensure that it is not held liable for violating the EAR.

The first option—to open and inspect shipments—is no option at all, as it is both impractical and unconstitutional.  FedEx is an express carrier that provides time and day-definite delivery services.  Neither FedEx nor any other similarly situated carrier with a worldwide span can offer an express service and yet inspect every package that triggers a true (or false) hit against BIS entities list, which includes thousands of named entities.  And, even if FedEx were to inspect packages, it does not mean that the company would have sufficient information to determine whether the contents qualify as an "item" that complies with, or violates, the EAR.  As explained below, that determination requires a highly technical analysis, which requires much more than a plain view inspection of the item shipped.  Not to mention that this government-imposed "option"

---

[12] In any event, FedEx *does* include specific allegations.  Compl. ¶¶ 6, 9, 10, 36–38, 40–42, 44, 47–51, 57, 61, 64.

would infringe on customers' Fourth Amendment privacy rights.  An outcome that FedEx is neither willing nor required to pursue.[13]

The second option—to return customer packages—also fails to withstand scrutiny, albeit rational basis review, because it is vastly over-inclusive.  Because FedEx cannot ascertain the contents of the shipment, it would be required to return all shipments destined for an entity on the Entity List, notwithstanding the fact that these shipments may in fact be compliant and legally exported.  If FedEx does not inspect the contents of customer packages, and does not return the packages, then the EAR leaves it no alternative but to assume the risk of a BIS enforcement action regardless of whether the package falls under the EAR.  This too is a vastly over-inclusive result that is not rationally related to a legitimate government purpose.

A.  The Regulations are Not Rationally Related to a Legitimate Government Purpose

Under the rational basis standard of review, the Court is required to ask two questions.  First, are the regulations directed at the achievement of a legitimate governmental purpose?  *See Romer v. Evans*, 517 U.S. 620, 631 (1996).[14]  Second, does the regulation rationally further that

---

[13] Interpreting the EAR to require common carriers to open and inspect customer packages would result in a violation of customers' Fourth Amendment privacy rights—an outcome that would subject the regulations to strict scrutiny.  *See Gouled v. United States*, 255 U.S. 298, 303–04 (1921) (rights under the Fourth and Fifth Amendment are indispensable to the full enjoyment of personal security, personal liberty and private property; "they are to be regarded as of the very essence of constitutional liberty; and the guaranty of them is as important and as imperative as are the guaranties of other fundamental rights of the individual citizen[.]"); *Kansas v. Ryce*, 368 P.3d 342 (Kan. 2016) (statute criminalizing chemical testing refusal was facially invalid based on substantive due process rights flowing from search and seizure principles; applying strict scrutiny, the court found that criminalizing refusal was not narrowly tailored to the state's compelling interests).  And, because opening and inspecting customer shipments is not narrowly tailored to serve the Government's interest in national security, the EAR, as interpreted in this manner, would fail.

[14] Although *Romer* was decided based on equal protection, the standard applied therein applies with equal force here: substantive due process claims receive the same rational basis review that is applied to equal protection claims.  *Jones v. Air Line Pilots Ass'n, Int'l*, 713 F. Supp. 2d 29, 37 n.7 (D.D.C. 1976); *see Adams v. United States*, 796 F. Supp. 2d 67, 77 (D.D.C. 2011); *George*

purpose? *Id.* Here, the first question is not in dispute. The purpose of the EAR is to promote national security and foreign policy interests. *See* 15 C.F.R. § 730.6. To that end, the EAR restricts the international export, reexport, and/or transfer, § 734.3, of certain "items" (commodities, technology, information, and software), § 744.16, to a person or entity on the "Entity List."

The dispute, rather, is limited to the question of whether the regulations, which hold FedEx strictly liable for EAR violations committed by others, are rationally related to this legitimate purpose. As applied to common carriers such as FedEx, they are not. The Supreme Court has made clear that, even when dealing with rational basis review, a law may be struck down if its substance is "so discontinuous with the reasons offered for it" that any pretense of rationality cannot be sustained. *Romer*, 517 U.S. at 632; *see also Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 644 (1974) (mandatory maternity leave policy violated substantive due process rights where arbitrary cut-off dates had no valid relationship to state interest); *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223–27 (5th Cir. 2013) ("The great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation.").

The Court's review includes considering whether, "in practical effect," the law simply does not operate to rationally further the legitimate purpose professed. *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 537 (1973); *St. Joseph Abbey v. Castille*, 712 F.3d 215, 223–27 (5th Cir. 2013) (law that required license to sell caskets intrastate bore no rational relationship to public health and safety); *Merrifield v. Lockyer*, 547 F.3d 978, 991–92 (9th Cir. 2008) (license exemption held unconstitutional where it "fail[ed] to meet the relatively easy standard of rational basis review");

---

*Wash. Univ. v. District of Columbia*, 391 F. Supp. 2d 109, 114 (D.D.C. 2005) (the rational basis analysis under due process and equal protection is almost indistinguishable in practice).

*March for Life v. Burwell*, 128 F. Supp. 3d 116 (D.D.C. 2015) (failure to exempt secular nonprofits from the Patient Protection and Affordable Care Act's contraception mandate lacked a rational basis); *Brown v. Barry*, 710 F. Supp. 352, 355 (D.D.C. 1989) (prohibition against shoe-shine vendors failed to pass rational basis test where there was no plausible connection between the prohibited conduct and the purpose of the law).

In practical effect, the regulations, as applied to FedEx, do not operate to rationally further the Government's legitimate purpose. The EAR prohibits the export, reexport, and transfer of certain "items subject to the EAR" to parties involved in "activities contrary to the national security or foreign policy interests of the United States," who are designated to the Entity List. § 744.16 FedEx has the ability and does in fact screen whether exports, reexports, and transfers are destined for parties on the Entity List. *See* Compl. ¶ 5.  The issue with the regulations, however, is that they require significantly more.  Because carriers such as FedEx may be held strictly liable for EAR violations, FedEx is required to determine whether its customers' packages contain an "item," defined as "commodities, software, and technology" (§ 772.1), which is "subject to the EAR." Packages exported from the United States would be "subject to the EAR" if they contain "items" that are not within the scope of an exception, *e.g.* information and software that arise during, or result from, "fundamental research," or that are published and publicly available.  § 734.3(b)(3). Packages exported from outside the United States that do not transit the United States would be subject to the EAR if they contain certain U.S. content or were produced from certain U.S. technology, as described above. Whether the tendered package contains an "item subject to the EAR" is beyond FedEx's ability to determine: FedEx neither has control over nor actual knowledge of the contents of the packages shipped.  Thus, the EAR effectively forces FedEx to inspect the contents of its packages in a manner it is practically unable to do.

Even if FedEx were required to inspect the contents of every package it ships, it would still not have sufficient information to make highly technical determinations to assess whether the shipment contains an "item subject to the EAR."  For example, a computer brought to a FedEx location for shipment may incorporate greater than a *de minimis* level of U.S. controlled content by value, and be deemed an "item subject to the EAR" prohibited for reexport to parties on the Entity List, or it may not.  FedEx is powerless to make this determination and prevent shipment of prohibited "items subject to the EAR."  Accordingly, holding FedEx strictly liable for violations of the EAR does not further national security because FedEx is not in a position to know whether the shipments violate the EAR.

In support of the application of the regulations to FedEx, the Government argues: "It is inevitable that some exporters, intentionally or not, will attempt to ship items prohibited by the EAR, and requiring intermediaries to comply with the regulations makes it less likely that such attempts will be successful."  Defs.' Mot. Dismiss, at 14.  Commerce further contends that application of the regulations to common carriers is rational because it "promotes compliance with the EAR generally, and therefore reduces the extent to which sensitive and dangerous items reach potential bad actors." *Id*.  Yet, Commerce fails to explain how these regulations promote compliance with the EAR, nor does it explain how "promoting compliance" is sufficient to satisfy the "rationally related" requirement.  It is not.

Notably, pursuant to the EAR, a common carrier can be held strictly liable under §764.2(b) for causing its customer's prohibited export when, in fact, it is the customer who violated one of the General Prohibitions.  While the customer is only held liable if it "knowingly" engages in a prohibited export, the common carrier is held to a strict liability standard under the separate "Violations" section of the EAR.  Thus, FedEx may be held liable for customer violations in

situations where the customer itself would not be found liable.  This outcome belies Commerce's contention that a system whereby FedEx must monitor the packages would promote shipper compliance with the EAR.

Further, Commerce's contention that applying the EAR to common carriers incentivizes third-parties to comply with the EAR is simply factually wrong and highlights the inherent danger of dismissing challenges before the parties have the opportunity to develop the factual record beyond the allegations of the Complaint.  *See St. Joseph Abbey*, 712 F.3d at 223 ("[A]lthough rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality."); *Gordon v. Holder*, 721 F.3d 638, 645 (D.C. Cir. 2013)*; Pearson v. Callahan*, 555 U.S. 223, 239 (2009) (describing the dangers of premature resolution of constitutional questions); *Mitchell v. Forsyth*, 472 U.S. 511, 549–50 (1985) (Brennan, J., dissenting) ("[R]esolution of even the most abstract legal disputes is advanced by the presence of a concrete set of facts."); *Gault v. Garrison*, 569 F.2d 993, 996 (7th Cir. 1977) (denying motion to dismiss since, as an evidentiary matter, the state had not shown a rational basis for the legislation other than their conclusory remarks).  The Government simply misapprehends the EAR's regulatory scheme.  A more thorough development of the evidence would show that Commerce's contention is wrong because, as previously stated, FedEx does not have the ability or expertise to determine whether a given shipment tendered for delivery violates the EAR, and therefore is incapable of "making it less likely" that others will attempt to violate the EAR.  As a result, application of the regulations to FedEx fails to further national security.

Commerce's argument to the contrary is not availing, nor is the case law it relies upon.  Commerce relies on *Karn v. U.S. Dep't of State* in support of its argument that the law in question

here satisfies the rational basis standard.  *See* Defs.' Mot. Dismiss, at 13-14 (citing 925 F. Supp.

1, 13 (D.D.C. 1996)).   Unlike in the present case, where FedEx does not know what is being

shipped and whether it is considered an "item" as defined in the statute, the plaintiff in *Karn*, an

exporter, specifically submitted a commodity jurisdiction request to the Department of State, who

examined the item and determined that it was a "defense article" pursuant to the Arms Export

Control Act and the International Traffic in Arms Regulations.  *Id.* at 3-4.  The district court found

that the regulation in *Karn* was rationally related to a legitimate purpose because it advanced the

government's goal of discouraging export of certain commodities.  *Id.* at 13.  The EAR, however,

as it is applied to FedEx, does not advance Commerce's purpose, as FedEx is unable to know

whether the shipment it is transferring, transporting, or forwarding contains an "item," as defined

under the EAR. Indeed, *Karn* points up the irrationality of the EAR as applied to FedEx:  if an

exporter needs to solicit a determination on whether a commodity is subject to export regulations,

how can a common carrier be expected to make such decisions on the myriad of items tendered

for delivery every day?   "Were defendants to have their way here, rational basis review would

have all the bite of a rubber stamp!"  *March for Life*, 128 F. Supp. 3d 116, 125 (D.D.C. 2015).

  B.  The Regulations are Vastly Over-Inclusive

  A regulation is not rationally related to a legitimate government interest if it is vastly over-

inclusive.  *See Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 653 (Powell, J., concurring in the

result) (arguing that policy would fail rational basis review because it is "either counterproductive

or irrationally overinclusive"); *Estate of French*, 365 A.2d 621, 624 (D.C. 1976); *Robinson v.*

*Florida*, 804 So.2d 451, 452–53 (Fla. Dist. Ct. App. 4th 2001) (statute's broad definition of sexual

predator did not pass the rational basis test because the statute was over-inclusive as applied to the

defendant); *Cornwell v. Hamilton*, 80 F. Supp. 2d 1101 (S.D. Cal. 1999) (state's cosmetology

licensing requirement was constitutionally infirm due to overbreadth, because it included persons to whom the license was not relevant).

In *Estate of French,* the D.C. Court of Appeals held that the District of Columbia's Mortmain statute was unconstitutional because it violated the Equal Protection Clause and the Fifth Amendment.  *Estate of French*, 365 A.2d at 624.  The statute at issue invalidated all devises or bequests to a clergyman or religious organization if made within 30 days of the testator's death. *Id.*  The statute was intended to protect testators from being unduly influenced by religious considerations.  *Id.*  The Court concluded that the "statute [was] substantially over-inclusive in that it voids many intentional bequests by testators who were not impermissibly influenced or who [did] not have immediate family members in need of protection."  *Id.*  Accordingly, the Court held that the statute did not pass rational basis review.

Similarly, the EAR is substantially over-inclusive and thus fails rational basis review. Pursuant to the EAR's regulatory scheme, FedEx may be held liable for shipping a package to a party designated to the Entity List regardless of whether FedEx had knowledge about the contents of the package.[15]  As explained above, FedEx is not in a position to determine whether the packages contain items subject to the EAR, because FedEx does not know what is inside the package, unless it violates its customers' privacy rights by searching the contents in furtherance of a governmental end.  And, even if FedEx were to take this dramatic step, it is most likely true that FedEx, at least in some circumstances, would not know whether the contents of the package qualify

---

[15] The charges leading to FedEx's 2018 Settlement agreement with BIS provide a telling example. In its motion, the Government argues that "FedEx was required to reject such shipments [to listed entities] in the absence of a license."  Defs.' Mot. Dismiss, at 14–15.  The Government holds and has held FedEx liable for violating the EAR when packages are shipped to designated entities, regardless of whether those packages contain "items subject to the EAR."

as "items subject to the EAR." That determination requires a highly technical analysis that requires much more than a plain view inspection of the item shipped.

Thus, given the government's enforcement posture, FedEx's only alternative is to return all shipments destined for parties on the Entity List. This result might eliminate the shipment of "items subject to the EAR" to such parties, but it would do significantly more. It would also proscribe the shipment of packages that are not covered by the EAR. The regulations, accordingly, are unconstitutionally over-inclusive as applied to FedEx, and enforcing the regulations would permit Commerce to impose severe deprivations that far exceed the authority granted by ECRA.

## **CONCLUSION**

For the forgoing reasons, FedEx respectfully requests that the Court deny Commerce's Motion to Dismiss.

Dated: October 8, 2019                    Respectfully Submitted,

By:      */s/ Maurice Bellan*
         **Maurice Albert Bellan**
         BAKER & MCKENZIE LLP
         815 Connecticut Avenue NW
         Washington, DC 20006
         (202) 452-7057
         Fax: (202) 416-7057
         Maurice.Bellan@bakermckenzie.com


         **Kimberly F. Rich**
         BAKER & MCKENZIE
         1900 North Pearl Street, Suite 1500
         Dallas, TX 75201
         (214) 978-3051
         Fax: (214) 965-5998
         Kimberly.Rich@bakermckenzie.com
         Admitted *PRO HAC VICE*

         *Counsel for Plaintiff FedEx Corporation*