UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **FEDERAL EXPRESS CORPORATION,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 19-1840 (JDB)** |
| **U.S. DEPARTMENT OF COMMERCE, et al.,** | |
| **Defendants.** | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Federal Express Corporation ("FedEx") is a global shipping company whose subsidiaries collectively ship millions of packages to over two hundred countries and territories daily. FedEx brings this suit against the U.S. Department of Commerce, Wilbur Ross in his official capacity as Secretary of Commerce, the Bureau of Industry and Security ("the Bureau"), and Nazak Nikakhtar in her official capacity as Assistant Secretary for Industry and Analysis (collectively, "the Department"), alleging that the Department's Export Administration Regulations ("the EAR"), <u>see</u> 15 C.F.R. § 730, violate the Due Process Clause of the Fifth Amendment and exceed the Department's delegated authority under the Export Control Reform Act of 2018, <u>see</u> 50 U.S.C. § 4801. Specifically, FedEx's amended complaint alleges that the EAR's export controls place such onerous restrictions on FedEx's shipping enterprise that it must either cease operations with certain foreign entities or risk imminent enforcement action. The Department moves for dismissal of both claims for lack of subject matter jurisdiction and failure to state a claim. For the reasons explained herein, the Court will grant the Department's motion and dismiss FedEx's amended complaint.

1

**Background**

### I.  The Export Controls Framework

The Department of Commerce, through the Bureau, oversees the nation's export control system.  Historically, the Department's authority to promulgate and administer export control regulations, like the EAR, derived from the Export Administration Act of 1979 ("EAA").  See 50 U.S.C. § 4601.  Over the years, the EAA lapsed several times, however, and during those periods, the EAR remained in force through a series of Executive Orders issued under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701.

In 2018, Congress overhauled the existing system with the Export Control and Reform Act ("ECRA"), which was passed as part of the National Defense Authorization Act for Fiscal Year 2019.  See Pub. L. 115-232, 132 Stat. 1636 (2018).  Under ECRA, the President, Secretary of Commerce, and various other officials are authorized to promulgate and administer the nation's export controls.  See 50 U.S.C. § 4801.  As relevant here, ECRA confers on the Secretary of Commerce the authority to "establish and maintain a list of items that are controlled" under the EAR, to "establish and maintain a list of foreign persons and end-uses that are determined to be a threat to the national security and foreign policy of the United States," and to "restrict exports, reexports, and in-country transfers of any controlled items to any foreign person or end-use" determined to threaten national security or foreign policy.  Id. § 4813(a)(1)–(4).

The EAR are the Department's primary export control regulations and are "intended to serve the national security, foreign policy, nonproliferation of weapons of mass destruction, and other interests of the United States."  15 C.F.R. § 730.6.  To that end, and with limited exceptions, the EAR regulate "any item warranting control that is not exclusively controlled for export, reexport, or transfer (in-country) by another [federal] agency."  Id. § 730.3.  If an item is subject

2

to regulation, then the EAR prohibit its export, reexport, and in-country transfer unless the person attempting to do so acquires a license from the Bureau—or otherwise qualifies for an exemption not relevant to this case.  Id. § 736.2(b).

The EAR's ambit is wide: "items subject to the EAR include purely civilian items, items with both civil and military, terrorism or potential [weapons-of-mass-destruction]-related applications, and items that are exclusively used for military applications."  Id. § 730.3.  For example, "the EAR regulate[] the export of commercial items which qualify as 'dual-use' items, meaning those that have 'both commercial and military or proliferation applications,' even if the item is purely commercial in its use."  United States v. 2011 Jeep Grand Cherokee, Civil Action No. DR-12-CV-18-AM-CW, 2013 WL 12106221, at *5 (W.D. Tex. Oct. 9, 2013).  Those items that qualify for regulation under the EAR are included on the Commerce Control List ("CCL"), which sets out the licensing requirements for exporting, re-exporting, or transferring such items.  See 15 C.F.R. pt. 774, Supp. 1.

In addition to the CCL, the Bureau also oversees the Entity List, which "identifies persons reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States."  Id. § 744.16.  As a rule, the EAR prohibit the export, reexport, or transfer of items on the CCL to those listed on the Entity List without a license from the Bureau.

## II.    FedEx's Shipping Operations

FedEx is a private corporation that "provides a broad portfolio of transportation, e-commerce, and business services."  Compl. for Declaratory, Injunctive & Other Relief ("Am. Compl.") [ECF No. 24] ¶ 2.  As relevant here, FedEx offers a range of shipping services that "receive approximately 15 million packages for shipment daily" and "span[] more than 220

countries and territories."  Id. ¶ 3.

These shipment services are subject to several statutory and regulatory requirements, including ECRA and, consequentially, the EAR.  Id. ¶ 4.  In order to comply with these requirements, FedEx has developed "a sophisticated proprietary risk-based compliance system" to "screen[] the names and addresses of its shippers and the designated recipients prior to delivering any package in order to identify whether the sender and/or recipient are an entity or person on the EAR's Entity List."  Id. ¶ 5 (internal quotation marks omitted).  Nevertheless, FedEx contends that the EAR "require considerably more screening than possible" because determining "whether the tendered package contains an item subject to the EAR" is "virtually impossible for common carriers to comply with."  Id. ¶ 6.  For example, adhering to the CCL "effectively forces FedEx to police the content of its packages on an almost infinitely broad scale," which proves especially difficult when a customer's shipment includes technology or software that is not easily screened, even with manual inspection.  Id. ¶¶ 28, 48.

FedEx has already been subject to administrative proceedings arising from alleged violations of the EAR—specifically, allegations by the Bureau that FedEx committed 53 violations of the EAR by shipping restricted items to France and Pakistan without the requisite Bureau licenses.  Id. ¶¶ 52–53.  In April 2018, FedEx entered into a settlement agreement with the Bureau to pay a civil penalty of $500,000 and to audit its export controls compliance program in light of these alleged breaches.  Id. ¶¶ 52, 54.

### III.    Litigation History

On June 24, 2019, FedEx filed this lawsuit, seeking declaratory and injunctive relief from the obligations imposed by the EAR.  See Compl. for Declaratory, Injunctive & Other Relief [ECF No. 1] at 18.  In particular, FedEx alleges that the EAR, as currently formulated by the Department,

4

violate the Due Process Clause of the Fifth Amendment and are ultra vires, exceeding the authority provided to the Department under ECRA.  See Am. Compl. ¶¶ 65–89.  FedEx seeks injunctive and declaratory relief designating the EAR as "unlawful as applied" to FedEx and barring the Department "from enforcing § 736 [of] the EAR against" it.  Id. at 18.

The Department has moved to dismiss the complaint, arguing that this Court lacks jurisdiction to review the ultra vires claim and that, on the merits, both claims must fail.  See Mem. of P. & A. in Supp. of Defs.' Mot. to Dismiss Compl. ("Defs.' Mot.") [ECF No. 18] at 1–3.  FedEx opposes the motion, see generally Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss ("Pl.'s Opp'n") [ECF No. 20].  With all briefs having now been submitted, the motion is ripe for consideration.[1]

## **Legal Standard**

"Federal courts are courts of limited jurisdiction," Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994), and a party claiming subject matter jurisdiction "has the burden to demonstrate that it exists," Khadr v. United States, 529 F.3d 1112, 1115 (D.C. Cir. 2008).  Under Federal Rule of Civil Procedure 12(b)(1), a federal district court has an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority, Grand Lodge of the Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001), and "must dismiss a case when it lacks subject matter jurisdiction," Randolph v. ING Life Ins. & Annuity Co., 486 F. Supp. 2d 1, 4 (D.D.C. 2007).  "Where a motion to dismiss a complaint present[s] a dispute over the factual basis of the court's subject matter jurisdiction . . . the court may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant,"

---

[1] Although FedEx has filed an amended complaint, see Mot. for Leave to File Amend Compl. [ECF No. 22], the amendments were superficial, and thus the Court can proceed based on briefs previously filed with respect to the original complaint.

but instead "must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." Feldman v. Fed. Deposit Ins. Corp., 879 F.3d 347, 351 (D.C. Cir. 2018). For instance, the court may consider material other than allegations in the complaint in determining whether it has jurisdiction to hear the case. See Settles v. U.S. Parole Comm'n, 429 F.3d 1098, 1107 (D.C. Cir. 2005).

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), courts presume the truth of a complaint's factual allegations, but are "not bound to accept as true a legal conclusion couched as a factual allegation." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal quotation omitted). Courts then ask whether the facts alleged suffice "to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation omitted). Under Rule 12(b)(6), courts consider "facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." Mpoy v. Rhee, 758 F.3d 285, 291 n.1 (D.C. Cir. 2014) (internal quotation omitted).

## Analysis

### I.  Substantive Due Process Claim

The Department first challenges FedEx's Fifth Amendment Substantive Due Process claim. See Defs.' Mot. at 12–16. FedEx alleges that the EAR, as currently formulated, "deprive FedEx of liberty and property by arbitrarily and irrationally precluding FedEx from carrying out the basic functions of its business as a common carrier." Am. Compl. ¶ 72. Specifically, FedEx argues that the EAR require the company either "to cease all business operations that create a reasonable risk of violat[ing]" the EAR or to "proceed with its business operations and face a substantial risk that it will violate the EAR and suffer harm." Id. ¶ 71.

"Unless legislation infringes a fundamental right, judicial scrutiny under the substantive due process doctrine is highly deferential." Empresa Cubana Exportadora de Alimentos y Productos Varios v. U.S. Dep't of Treasury, 638 F.3d 794, 800 (D.C. Cir. 2011). Under Supreme Court precedent, fundamental rights include the rights "to marry," "to have children," "to direct the education and upbringing of one's children," and "to bodily integrity." Washington v. Glucksberg, 521 U.S. 702, 720 (1997). This case, which turns on FedEx's putative right to continue its global shipping operations as currently practiced, concerns strictly economic burdens on FedEx's enterprise and involves no fundamental rights that the Supreme Court or the D.C. Circuit has ever identified. As FedEx acknowledges, see Pl.'s Opp'n at 24–25, this Court must therefore "ask only whether the legislation is rationally related to a legitimate government interest," Empresa Cubana, 638 F.3d at 800.

"Rational basis review 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" Gordon v. Holder, 721 F.3d 638, 656 (D.C. Cir. 2013) (quoting FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 315 (1993)). Under rational basis review, FedEx "has a claim only if [it] can show that there is no rational relationship between [the EAR regulations] and some legitimate governmental purpose." Id. (internal quotation marks omitted). Indeed, "[i]n the ordinary case, 'a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous.'" Id. (quoting Romer v. Evans, 517 U.S. 620, 632 (1996)).

The EAR easily satisfy this forgiving standard. The regulations state that they advance "national security, foreign policy, nonproliferation of weapons of mass destruction, and other interests of the United States." 15 C.F.R. § 730.6; see also Am. Compl. ¶ 24 ("The EAR . . . set out the U.S. Government's principal export control regime, restricting the international transfer of

commodities, technology, information, and software for reasons of national security and foreign policy."). National security and foreign policy are core matters of legitimate federal concern, see Holder v. Humanitarian Law Project, 561 U.S. 1, 33–34 (2010), and the EAR rationally relate to those concerns by preventing hostile foreign actors from obtaining materials or technology that could harm U.S. interests. See, e.g., Karn v. U.S. Dep't of State, 925 F. Supp. 1, 13 (D.D.C. 1996) (concluding that "the regulation [under the Arms Export Control Act] of the export of . . . cryptographic software is a rational means of" promoting the government's "interest in preventing the proliferation of cryptographic software to foreign powers").

FedEx does not dispute that the EAR are intended "to promote national security and foreign policy interests," nor that such interests are legitimate. Pl.'s Opp'n. at 25 (citing 15 C.F.R. § 730.6). Rather, FedEx contends that the rigid nature of the current regulations, "which hold FedEx strictly liable for EAR violations committed by others," is not rationally related to the government's legitimate interests. Id. In particular, FedEx challenges the rationality of imposing strict liability on common carriers, like FedEx, when they ship a package to a party on the Entity List, but holding customers liable only if they "knowingly" engage in a prohibited shipment. Id. at 27–28. FedEx also argues that such regulations are "substantially over-inclusive" because, given FedEx's inability to screen packages for regulated items, its only option for avoiding liability under the EAR "is to return all shipments destined for parties on the Entity List." Id. at 30–31. That result, while it would prevent the shipment of regulated items to persons on the Entity List, sweeps in far too much conduct, in FedEx's telling.

These arguments are unpersuasive. It is not irrational for the government to create a strict-liability regime to prevent companies from aiding or abetting export violations that would jeopardize the country's national security or foreign policy interests. See Iran Air v. Kugelman,

996 F.2d 1253, 1258 (D.C. Cir. 1993) ("It is not unusual for Congress . . . to permit the imposition of civil sanctions without proof of the violator's knowledge.").  And it is not unreasonable for the Department to hold common carriers strictly liable for violations but to penalize customers only for knowing violations.  Unlike potentially one-off consumers, common carriers are repeat players with the institutional knowledge and scale to navigate the EAR, thus it is reasonable that common carriers might be held to a higher standard.  Even in the domestic realm, the D.C. Circuit has upheld under rational-basis review a ban on the shipment of tobacco products, noting that "Congress must be allowed leeway to approach a perceived problem incrementally" and that it is "entirely rational" to supplement such regulations—including implementing a total ban—if less rigorous measures prove ineffective.  Gordon, 721 F.3d at 657 (internal quotation marks omitted).

Such reasoning applies with equal, if not greater, force in the context of national security and foreign policy, where Congress—and any agency to whom Congress delegates authority—is permitted to ban the shipping of certain products to a foreign country.  See, e.g., Freedom to Travel Campaign v. Newcomb, 82 F.3d 1431, 1439 (9th Cir. 1996) (outlining "a history of judicial deference" to the political branches' foreign policy decisions, such as the Executive's decision to implement the Cuban embargo).  That the EAR allow for some exports to persons designated on the Entity List, even if screening shipments for restricted items proves difficult, does not then make those regulations irrational or "substantially over-inclusive," Pl.'s Opp'n. at 30.  And, indeed, "[e]ven if the classification involved here is to some extent both underinclusive and overinclusive, . . . perfection is by no means required" under the Fifth Amendment when formulating an economic regulation.  Vance v. Bradley, 440 U.S. 93, 108 (1979) (internal quotation marks omitted).  For purposes of the Due Process Clause, all that is required is that the EAR be "rationally related to a legitimate government interest," Empresa Cubana, 638 F.3d at 801,

which the Department has adequately demonstrated here.

The Court thus concludes that Count I of FedEx's amended complaint, see Am. Compl. ¶¶ 65–73, must be dismissed for failure to state a claim upon which relief can be granted.

## II.     Ultra Vires Claim Under Export Control Reform Act of 2018

The Department next argues that FedEx's ultra vires claim under ECRA must fail, for several reasons.  First, the Department raises two jurisdictional challenges, contending (1) that FedEx's ultra vires claim involves a non-justiciable political question, see Defs.' Mot. at 18–22; and (2) that ECRA itself withdraws jurisdiction over suits challenging "functions exercised under" the Act, see id. at 22–27.  And even assuming that this Court has subject matter jurisdiction, the Department maintains that FedEx's complaint fails to allege "a clear violation of ECRA," as is necessary to succeed on an ultra vires claim, both (3) because the complaint does not lay out a clear legal conflict between the EAR and ECRA, id. at 27, and (4) because FedEx's complaint fails to provide adequate facts "alleg[ing] a plausible violation of ECRA," id. at 31.  The Court considers each of these arguments in turn.

A.   Political Question

"The political question doctrine excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 (1986).  Under binding D.C. Circuit precedent, whether a claim raises a political question is a jurisdictional question and thus must be addressed before the Court can turn to the merits of FedEx's ultra vires claim.  See Al-Tamimi v. Adelson, 916 F.3d 1, 7–8 (D.C. Cir. 2019); see also Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining

to the court is that of announcing the fact and dismissing the cause." (quotation omitted)).  To do so, the Court follows a three-step process: first, "identify[ing] the issues raised by [FedEx's] complaint"; then, using the six factors outlined in the Supreme Court's decision in <u>Baker v. Carr</u>, 369 U.S. 186 (1962), "to determine whether any issue presents a political question"; and finally, deciding whether the claims are "inextricable from the case" or "can be resolved without considering any political question."  <u>Al-Tamimi</u>, 916 F.3d at 8 (internal quotation omitted).

Here, the initial step of identifying the relevant issues is complicated by FedEx's shifting description of its ultra vires claim.  In its complaint, FedEx frames its claim as being based on "the policy objectives of . . . ECRA," Am. Compl. ¶ 79—specifically, FedEx alleges that "[t]he EAR's broad prohibition on aiding and abetting, without exception, exceeds [the Department's] authority to use the export controls 'only to the extent necessary' to protect the national security of the United States or further significantly its foreign policy," <u>id.</u> ¶ 83 (quoting 50 U.S.C. § 4811(1)).  But in its opposition to the Department's motion to dismiss, FedEx shifts its focus from ECRA's policy statement, <u>see</u> 50 U.S.C. § 4811, to its penalties section, <u>see id.</u> § 4819.  <u>See</u> Pl.'s Opp'n at 4–5, 15–17.  Under this reformulated ultra vires challenge, the key issue becomes not whether the EAR restrict shipping activities more than is "necessary," 50 U.S.C. § 4811, but "whether ECRA gives [the Department] authority to punish transferring, transporting, or forwarding [restricted items] without knowledge," Pl.'s Opp'n at 16.[2]

Looking solely to FedEx's claim as presented in its complaint, the Court acknowledges that it may raise a political question.  Deciding whether "[t]he EAR's broad prohibition on aiding

---

[2] The Court views this shift found in FedEx's legal memorandum as the articulation of a new legal theory to support the existing ultra vires claim, rather than as an amendment to the complaint itself.  "[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss," <u>Car Carriers, Inc. v. Ford Motor Co.</u>, 754 F.2d 1101, 1107 (7th Cir.), <u>cert. denied</u>, 470 U.S. 1054 (1984), but plaintiffs can "set forth [new] theories in a brief," <u>Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.</u>, 836 F.2d 173, 181 (3d Cir. 1988).  Whether focused on § 4811 or § 4819, the underlying facts of FedEx's claim remain the same; thus, the Court will interpret this shift in argument as one in the legal theory applied, rather than the claims raised.

and abetting, without exception," is more restrictive than "necessary" to protect "the national security of the United States" or "to further significantly the foreign policy of the United States," see 50 U.S.C. § 4811(1)—as FedEx's complaint urges the Court to do, see Am. Compl. ¶¶ 74–89—appears to implicate at least a couple of the Baker factors, see 369 U.S. at 217.  Nevertheless, the Court need not decide this point because FedEx abandons its initial framing of the ultra vires claim in its opposition brief to the Department's motion to dismiss, and this new formulation does not raise the same political question concerns.  Compare Am. Compl. ¶¶ 74–89, with Pl.'s Opp'n at 15–16.  Moreover, the Department itself acknowledges that FedEx's "alternative argument does not raise a political question."  Reply Mem. in Supp. of Defs.' Mot. to Dismiss the Compl. ("Defs.' Reply") [ECF No. 21] at 4.  The Court thus concludes that FedEx's reformulated ultra vires claim does not pose a political question and will now turn to the Department's second jurisdictional challenge to FedEx's ultra vires claim.

### B.  Statutory Preclusion Under 50 U.S.C. § 4821(a)

The Department next contends that FedEx's ultra vires claim is unreviewable because ECRA precludes judicial review of the core "functions" that the Department exercises under the Act. Defs.' Mot. at 23 (quoting 50 U.S.C. § 4821(a)).  The Department argues that "[t]he issuance, maintenance, update, and enforcement" of the EAR are all "functions exercised under" ECRA, and FedEx's suit is precluded, therefore, because its "complaint is premised on the notion that, unless it follows the EAR, it will be subject to enforcement actions and potential civil and criminal penalties, all of which are 'functions exercised under' [ECRA]."  Id. at 23–24.  Moreover, according to the Department, § 4821(a) blocks not just Administrative Procedure Act ("APA") review (e.g., arbitrary-and-capricious review), but also FedEx's ultra vires claim because the APA is the means by which Congress waived the federal government's sovereign immunity from suit.

Defs.' Reply at 6–7.   The Department believes that § 4821(a) "leaves open the possibility," however, "that a plaintiff might rely on a different waiver of sovereign immunity than the APA's Section 702 in challenging ECRA's relevant functions."   Id. at 7.

The Department's interpretation of § 4821(a) misunderstands the nature of ultra vires review, and conflicts with "the case law in this circuit[, which] is clear that judicial review is available when an agency acts ultra vires."   Aid Ass'n for Lutherans v. U.S. Postal Serv., 321 F.3d 1166, 1173 (D.C. Cir. 2003).   Under D.C. Circuit precedent, "[i]t does not matter . . . whether traditional APA review is foreclosed, because '[j]udicial review is favored when an agency is charged with acting beyond its authority.'"   Id. at 1172 (quoting Dart v. United States, 848 F.2d 217, 221 (D.C. Cir. 1988)); see also Griffith v. Fed. Labor Rels. Auth., 842 F.2d 487, 492 (D.C. Cir. 1988) ("Even where Congress is understood generally to have precluded review, the Supreme Court has found an implicit but narrow exception, closely paralleling the historic origins of judicial review for agency actions in excess of jurisdiction.").   Indeed, such ultra vires review long predates the APA, see Am. School of Magnetic Healing v. McAnnulty, 187 U.S. 94, 108, 110 (1902), and has persisted even since the APA's passage, see Chamber of Com. v. Reich, 74 F.3d 1322, 1326–28 (D.C. Cir. 1996) (gathering cases); see also Am. Hosp. Ass'n v. Azar, 964 F.3d 1230, 1238–39 (D.C. Cir. 2020) (discussing the ultra vires review doctrine).

The Department's reading of § 4821(a) is untenable.   Section 4821(a) provides that, with exceptions not relevant here, "the functions exercised under [the EAR] shall not be subject to sections 551, 553 through 559, and 701 through 706 of Title 5"—in other words, to the APA. While that provision explicitly precludes APA review of the Department's "functions exercised under" ECRA, it says nothing about judicial review in general.   Cf. Knapp Med. Ctr. v. Hargan, 875 F.3d 1125, 1127, 1131–32 (D.C. Cir. 2017) (holding that subject matter jurisdiction over

challenges to "the granting or denial of Medicare expansion applications" by the Department of Health and Human Services was precluded by a provision of the Affordable Care Act barring "administration or judicial review" of such decisions); Amgen Inc. v. Smith, 357 F.3d 103, 111 (D.C. Cir. 2004) (similar).   Thus, Congress cannot be "understood [even] generally to have precluded [judicial] review"—let alone ultra vires review.   Griffith, 842 F.2d at 492; see also Knapp, 875 F.3d at 1132 (noting that, even where judicial review may be specifically precluded, an ultra vires claim may nevertheless be viable).

The Department's argument based on sovereign immunity fares no better.   According to the Department, "[t]he only waiver of sovereign immunity plausibly available to FedEx is Section 702 of the APA, which waives the United States' sovereign immunity over actions against agencies and their officials seeking relief other than money damages."   Defs.' Reply at 5 (internal quotation marks omitted).   Because the Department's "functions" under ECRA are not "subject" to § 702, the Department posits that the waiver of sovereign immunity under the APA is unavailable and that FedEx's suit is barred absent another waiver.   Id. at 5–7.   Again, however, the Department's argument sits uneasily with Supreme Court and D.C. Circuit precedent, which recognizes "that sovereign immunity does not bar suits against government officials where the challenged actions of the officials are . . . beyond the official[s'] statutory authority."   Clark v. Library of Cong., 750 F.2d 89, 103 (D.C. Cir. 1984) (citing Larson v. Domestic & Foreign Corp., 337 U.S. 682, 689–91 (1949)); see also Swan v. Clinton, 100 F.3d 973, 981 (D.C. Cir. 1996) (noting that "sovereign immunity does not apply as a bar to suits alleging that an officer's actions were unconstitutional or beyond statutory authority").   Because FedEx raises an ultra vires claim, this exception to sovereign immunity applies, "and hence no waiver of sovereign immunity is required."   Swan, 100 F.3d at 981.

Finally, the Department's argument that ultra vires review is unavailable because § 4821(a) precludes review "through express language," Defs.' Reply at 9, is unavailing.  As noted above, § 4821(a) explicitly bars review under the APA, but the availability of ultra vires review is not dependent on the APA review process or on § 702's waiver of sovereign immunity.  And because the statute does not speak directly to ultra vires review or to judicial review in general, the Court has no occasion to decide what—if any—formulation of § 4821(a) would preclude ultra vires review.  The current version simply does not.

    C.  <u>Failure to State a Statutory Violation</u>

Having addressed the Department's jurisdictional arguments, the Court turns to the merits of FedEx's ultra vires claim, as refined in its opposition to the Department's motion to dismiss.  <u>See</u> Pl.'s Opp'n at 4–5.  In essence, FedEx argues that the EAR as presently structured constitute an ultra vires assertion of authority by the Department because they impose strict liability on common carriers who, under ECRA itself, face liability only for violating the relevant regulations "with knowledge."  Pl.'s Opp'n at 4–5, 16–17.  In other words, FedEx argues that, with respect to common carriers, ECRA contains a knowledge requirement that the EAR abandoned.

For this argument, FedEx focuses on the "Penalties" section of ECRA, 50 U.S.C. § 4819.  There, FedEx highlights two provisions: subsection (B), which makes it unlawful for a person to "cause or aid, abet, counsel, command, induce, procure, permit, or approve the doing of any action prohibited" by the EAR (hereinafter, "aiding and abetting"); and subsection (E), which makes it unlawful—among other actions—to "transfer, transport, finance, forward, or otherwise service" an item subject to the EAR "with knowledge that a violation" of ECRA or the EAR will or is intended to arise (hereinafter, "transferring").  <u>Id.</u> § 4819(a)(2)(B), (E).  According to FedEx, the separation of aiding and abetting from transferring provides clear evidence that Congress intended

for those two forms of action to be treated differently, with the latter form generating liability only when done knowingly.  See Pl.'s Opp'n at 4.  Relying on this separation, FedEx posits that "ECRA . . . commands that [transferring], which covers the core services provided by FedEx as a common carrier, only be punished if FedEx has knowledge that a violation of the EAR has occurred or will occur."  Id.

FedEx contends that the Department's formulation of the EAR's "General prohibitions and determination of applicability" and "Violations" sections, see 15 C.F.R. §§ 736.2, 764.2, vitiates this statutory structure and, ultimately, eliminates this knowledge requirement for transferring violations.  Pl.'s Opp'n at 4–5.  Specifically, FedEx argues that, while the EAR prohibit transferring items subject to its regulations only "with knowledge," see 15 C.F.R. §§ 736.2(b)(10), 764.2(e), FedEx can still be held strictly liable for "aiding and abetting" transferring under 15 C.F.R. § 764.2(b).  See Pl.'s Opp'n at 4–5.  This regulatory scheme, FedEx concludes, "patently contravenes the plain language of ECRA" and renders subsection (E) "wholly superfluous."  Id. at 4–5.  In sum, the core of FedEx's revised ultra vires claim is that the Department acts beyond its authority under ECRA if it holds FedEx strictly liable for transferring regulated items, but does so under the guise of aiding and abetting liability.  See id. at 5; see also id. at 6–7 (describing several examples of the Bureau imposing liability on common carriers without establishing their knowledge of the violation of the EAR).

The scope of non-APA ultra vires review is "narrow."  Sears, Roebuck & Co. v. U.S. Postal Serv., 844 F.3d 260, 265 (D.C. Cir. 2016).  "Courts will exercise their power to review alleged ultra vires agency action when an agency 'patently misconstrues a statute, disregards a specific and unambiguous statutory directive, or violates a specific command of a statute.'"  Hunter v.

F.E.R.C., 569 F. Supp. 2d 12, 16 (D.D.C. 2008) (quoting Griffith, 842 F.2d at 493), aff'd, 348 F. App'x 592 (D.C. Cir. 2009) (per curiam).

FedEx's claim fails under this strict standard.  FedEx alleges that the Department undermines the structure of ECRA's § 4819 by crafting the EAR to make transferring strictly liable under the aiding and abetting provision.  See Pl.'s Opp'n at 4–5.  But, as a textual matter, this argument is straightforwardly wrong.  The language of subsections (b) and (e) of the EAR's § 764.2 is almost identical to the language in subsections (B) and (E) of ECRA's § 4819, with only minor adjustments to the lists of prohibited actions that are not relevant here.  See Defs.' Reply at 13–14.  It is thus the original structure of ECRA, rather than the Department's replication of that structure in § 764.2, that raises the possibility that strict liability for aiding and abetting might swallow up any liability for transferring with knowledge and render § 4819(a)(2)(E) superfluous.[3]

Assuming, however, that FedEx's claim is not limited to the textual structure of § 764.2, but rather concerns the Department's alleged practice of holding common carriers strictly liable for violations of the EAR, see Pl.'s Opp'n at 6–7, the Court nevertheless concludes that FedEx's ultra vires claim must fail.  To start, FedEx's argument that common carriers, like itself, can be liable only for transferring, and not for aiding and abetting, has no clear basis in the statutory language.  See 50 U.S.C. § 4819(a)(2)(B), (E).  Although there is a strong argument to be made for interpreting § 4819(a)(2)(E) to cover FedEx's core practices, the Department's potential interpretation of FedEx's behavior as aiding and abetting is hardly a patent misconstruction of

---

[3] FedEx also attempts to make hay out of § 736.2's "General Prohibition" on transferring.  See Pl.'s Opp'n at 4–5.  FedEx describes this General Prohibition as a "carve-out" for the actions of common carriers, which the EAR then fail to protect in § 764.2.  Id.  But this reading is unpersuasive because these General Prohibitions serve just as a summary of the various restrictions that receive greater treatment in later provisions of the EAR.  Moreover, there is no reason to think that the prohibition on transferring items in § 726.2(10) has any bearing on the later list of "Violations" in § 764.2, where transferring is again mentioned.  FedEx never explains otherwise, merely positing that this structure somehow implies that common carriers should be exempt from strict liability under the EAR.  See id. Absent some further statutory, regulatory, or precedential support, however, this argument falls flat.

ECRA or a violation of specific statutory commands.  See Hunter, 569 F. Supp. 2d at 16. Moreover, FedEx's reading assumes that a particular action cannot lead to liability under multiple subparts of § 4819(a)(2).  See Defs.' Reply at 12.  But an approach such as the one the Department has taken is perfectly reasonable, and the Bureau structures its penalties to account for violators' "awareness of the conduct giving rise to the apparent violation."  Id. (citing 15 C.F.R. Part 766, Supp. No. 1 at III.B); see also 15 C.F.R. Part 766, Supp. No. 1 at III.B ("Generally, the greater a Respondent's actual knowledge of, or reason to know about, the conduct constituting an apparent violation, the stronger the [Bureau's] enforcement response will be.").

The Court acknowledges that the structure of § 4819(a)(2)—and, correspondingly, § 764.2—is not entirely elegant and may lead to some confusion.  For instance, there is an interpretive "presumption that statutory language is not superfluous."  McDonnell v. United States, 136 S. Ct. 2355, 2369 (2016) (internal quotation marks omitted).  But under either reading proffered by the parties, some aspect of § 4819(a)(2) becomes largely irrelevant: either subsection (E), with its knowledge requirement, risks being swallowed by the strict-liability regime in subsection (B), or subsection (B) loses much of its heft if all violations outlined in subsection (E) can generate liability only with knowledge.  See Pl.'s Opp'n at 4; Defs.' Reply at 11–12; see also 50 U.S.C. § 4819(a)(2)(E) ("No person may order, buy, remove, conceal, store, use, sell, loan, dispose of, transfer, transport, finance, forward, or otherwise service, in whole or in part, or conduct negotiations to facilitate . . . a violation of [the EAR, with knowledge].").  Neither option is ideal, but the Court cannot declare that the Department's application of aiding and abetting liability constitutes a patent misreading of the statute.

In sum, the Court concludes that FedEx has not made out a legal claim of ultra vires action by the Department and will dismiss Count II of FedEx's amended complaint, see Am. Compl.

¶¶ 74–89.  And because that determination resolves the Department's motion, the Court need not weigh in on the Department's final argument that FedEx's amended complaint fails to state a claim for a violation of ECRA.

## **Conclusion**

For all the foregoing reasons, FedEx's motion to dismiss will be granted.  A separate order will be issued on this date.

/s/
_____
JOHN D. BATES
United States District Judge

Dated:  <u>September 10, 2020</u>